FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

DEC 15 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| CALVARY CHAPEL DAYTON VALLEY,<br><br>Plaintiff-Appellant,<br><br>v.<br><br>STEVE SISOLAK, in his official capacity as Governor of Nevada; AARON FORD, in his official capacity as the Nevada Attorney General; FRANK HUNEWILL, in his official capacity as Sheriff of Lyon County,<br><br>Defendants-Appellees. | No.   20-16169<br><br>D.C. No.<br>3:20-cv-00303-RFB-VCF<br><br>OPINION |

Appeal from the United States District Court
for the District of Nevada
Richard F. Boulware II, District Judge, Presiding

Argued and Submitted December 8, 2020
San Francisco, California

Before:  DANNY J. BOGGS,* MILAN D. SMITH, JR., and MARK J. BENNETT, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

M. SMITH, Circuit Judge:

Calvary Chapel Dayton Valley (Calvary Chapel) challenges Nevada

---

* The Honorable Danny J. Boggs, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

Governor Steve Sisolak's Directive 021 (the Directive) as a violation of the Free Exercise Clause of the First Amendment to the United States Constitution. The district court denied the church's request for a preliminary injunction barring enforcement of the Directive against houses of worship. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 12, 2020, Nevada Governor Steve Sisolak declared a state of emergency in Nevada because of the spread of COVID-19, and issued emergency directives aimed at limiting the spread of the virus. The specific emergency directive challenged here is Directive 021, which Governor Sisolak issued on May 28, 2020.[1]

The Directive "strongly encourage[s]" all Nevadans to stay at home "to the

---

[1] Although the Directive is no longer in effect, we held in an order denying the State's motion to dismiss that Calvary Chapel's case is not moot. Governor Sisolak could restore the Directive's restrictions just as easily as he replaced them, or impose even more severe restrictions. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000); *see also Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 344–45 (7th Cir. 2020). In fact, Governor Sisolak has issued numerous emergency directives after Directive 021. For example, Directive 035, which is currently in effect, limits houses of worship to "the lesser of 25% of the listed fire code capacity or 50 persons." In contrast, it imposes only a 25% limit on commercial entities such as casinos; bowling alleys, arcades, miniature golf facilities, amusement parks, and theme parks; restaurants, food establishments, breweries, distilleries, and wineries; museums, art galleries, zoos, and aquariums; and gyms, fitness facilities, and fitness studios. **Declaration of Emergency for Directive 035, https://gov.nv.gov/News/Emergency_Orders/2020/2020-11-24_-_COVID19_Emergency_Declaration_Directive_035**. Although the only directive before us today is the Directive, we emphasize that all subsequent directives are subject to the same principles outlined in this opinion, and that many of the issues we identify in the Directive persist in Directive 035.

greatest extent possible." In general, it prohibits gatherings of more than fifty people "in any indoor or outdoor area[.]" More specifically, the Directive imposes limits of the lesser of 50% of fire-code capacity or 50 people in movie theaters (per screen), museums, art galleries, zoos, aquariums, trade schools, and technical schools. It prohibits public attendance at musical performances, live entertainment, concerts, competitions, sporting events, and any events with live performances. Retail businesses, bowling alleys, arcades, non-retail outdoor venues, gyms, fitness facilities, restaurants, breweries, distilleries, wineries, and body-art and piercing facilities must cap attendance at 50% of their fire-code capacities. The Directive delegates the power to regulate casino occupancy to the Nevada Gaming Control Board, which ultimately imposed an occupancy cap of 50% of fire-code capacity, in addition to a wide variety of other restrictions and requirements.

Calvary Chapel challenges § 11 of the Directive, which imposes a fifty-person cap on "indoor in-person services" at "houses of worship." The church alleges that gathering its members in one building "is central to [its] expression of [its] faith in Jesus Christ," and the Directive unconstitutionally burdens this religious expression. Calvary Chapel further argues that the Directive is not neutral or generally applicable because it targets, discriminates against, and shows hostility toward houses of

worship.[2]

The district court denied Calvary Chapel's motion for injunctive relief. The court concluded that the church did not demonstrate a likelihood of success on its Free Exercise claim, relying heavily on Chief Justice Roberts's concurrence in *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (mem.). Like the Chief Justice in *South Bay*, the district court found that the State treated similar secular activities and entities—including lectures, museums, movie theaters, trade and technical schools, nightclubs, and concerts—the same as or worse than church services. Accordingly, the court concluded that the Directive was neutral and generally applicable.

After appealing the district court's order, Calvary Chapel filed an emergency motion with our court for an injunction pending appeal. A two-judge panel of our court denied the church's motion. *See Calvary Chapel Dayton Valley v. Sisolak*, No. 20-16169, 2020 WL 4274901, at *1 (9th Cir. July 2, 2020). The church next turned to the Supreme Court, filing an application seeking injunctive relief pending appeal. The Supreme Court denied that application. *See Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (2020) (mem.). Calvary Chapel then filed a petition for a

---

[2] Calvary Chapel included an as-applied challenge to the Directive in its First Amended Complaint. The district court found that Calvary Chapel did not provide a sufficient factual basis for this claim. Calvary Chapel did not appeal this ruling of the district court.

writ of certiorari before judgment with the Supreme Court, *see* Sup. Ct. R. 11, and that petition remains pending while we consider the church's merits appeal to our court.

In this appeal, Calvary Chapel contends that § 11 of the Directive is not neutral and generally applicable because it expressly treats at least six categories of secular assemblies better than it treats religious services. These categories include casinos, restaurants and bars, amusement and theme parks, gyms and fitness centers, movie theaters, and mass protests. Because of these facial defects, Calvary Chapel seeks to apply strict scrutiny review to the Directive, and contends that the State has failed to demonstrate that it has a compelling interest, or that the Directive is narrowly tailored.

In response, the State argues that *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), provides the proper framework governing a state's authority during a public health crisis. The State further argues that even if *Jacobson* does not apply, the Directive does not violate the Free Exercise Clause because it is a neutral and generally applicable law—it imposes "[s]imilar or more severe restrictions . . . to comparable secular gatherings." *South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).

We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), and we reverse.

**STANDARD OF REVIEW**

5

We review "the district court's decision to grant or deny a preliminary injunction for abuse of discretion." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam). "Within this inquiry, [this court] review[s] the district court's legal conclusions de novo and its factual findings for clear error." *Ramos v. Wolf*, 975 F.3d 872, 888 (9th Cir. 2020) (citing *Hernandez v. Sessions*, 872 F.3d 976, 987 (9th Cir. 2017)).

## ANALYSIS

"The Free Exercise Clause of the First Amendment, which has been made applicable to the States by incorporation into the Fourteenth Amendment . . . provides that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]'" *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 876–77 (1990) (internal citations and emphasis omitted). In determining whether a law prohibits the free exercise of religion, courts ask whether the law "is neutral and of general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Smith*, 494 U.S. at 879). If it is, then the law need only survive rational basis review—even if it "has the incidental effect of burdening a particular religious practice." *Id.* If it is not neutral and generally applicable, the law must survive strict scrutiny review. *Id.* at 546.

6

The Supreme Court's recent decision in *Roman Catholic Diocese of Brooklyn v. Cuomo*, --- S. Ct. ----, 2020 WL 6948354 (2020) (per curiam), arguably represented a seismic shift in Free Exercise law, and compels the result in this case.[3] In *Roman Catholic Diocese*, two houses of worship sought an injunction pending their appeal in the Second Circuit from the Supreme Court, seeking relief from an Executive Order issued by the Governor of New York that addressed the spread of COVID-19 in the state. That order imposed "restrictions on attendance at religious services in areas classified as 'red' or 'orange' zones." *Id.* at *1. In red zones, religious service attendance was capped at 10 people, and in orange zones, it was capped at 25. *Id.* In both zones, however, the order provided that essential businesses could "admit as many people as they wish[ed]." *Id.* at *2. The Court did not provide an exhaustive list of businesses deemed "essential," but did note that "acupuncture facilities, camp grounds, garages, . . . plants manufacturing chemicals and microelectronics[,] and all transportation facilities" were included. *Id.*

---

[3] We respectfully join the Supreme Court in saying that members of our court "are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area. But even in a pandemic, the Constitution cannot be put away and forgotten. The restrictions at issue here, by effectively barring many from attending religious services, strike at the very heart of the First Amendment's guarantee of religious liberty. Before allowing this to occur, we have a duty to conduct a serious examination of the need for such a drastic measure." *Roman Catholic Diocese*, 2020 WL 6948354, at *3.

Moreover, in orange zones, even "non-essential businesses [could] decide for themselves how many persons to admit." *Id.*

The Court ultimately concluded that the houses of worship had shown a likelihood of success on the merits. *Id.* at *1. The challenged executive order, the Court held, "violate[d] 'the minimum requirement of neutrality' to religion." *Id.* (quoting *Church of Lukumi*, 508 U.S. at 533). Under the Court's reasoning, the New York order was not neutral because it "single[d] out houses of worship for especially harsh treatment." *Id.* For example, "a large store in Brooklyn . . . could literally have hundreds of people shopping there on any given day," whereas "a nearby church or synagogue would be prohibited from allowing more than 10 or 25 people inside for worship service." *Id.* at *2 (internal quotations omitted). The Court held that this "disparate treatment" of religion rendered the COVID-19 restrictions in the order not neutral or generally applicable. *Id.* *But see Church of Lukumi*, 508 U.S. at 533; *Smith*, 494 U.S. at 878.

Applying strict scrutiny review to the New York order, the Court held that "[s]temming the spread of COVID-19 is unquestionably a compelling interest," but concluded the challenged order was not narrowly tailored. *Roman Catholic Diocese*, 2020 WL 6948354, at *2. The Court reasoned that "[n]ot only is there no evidence that the [two houses of worship] have contributed to the spread of COVID-19[,] but there were many other less restrictive rules that could be adopted to minimize the

risk to those attending religious services," emphasizing that the New York restrictions are "far more severe than has been shown to be required to prevent the spread of the virus." *Id.* For example, New York could have tied maximum attendance at a religious service "to the size of the church or synagogue." *Id.* Because the COVID-19 restrictions in the order did not survive strict scrutiny—and the houses of worship satisfied the other *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), factors—the Court preliminarily enjoined the "enforcement of the Governor's severe restrictions on the [houses of worship's] religious services." *Id.* at \*4.

The Supreme Court's decision in *Roman Catholic Diocese* compels us to reverse the district court. Just like the New York restrictions, the Directive treats numerous secular activities and entities significantly better than religious worship services. Casinos, bowling alleys, retail businesses, restaurants, arcades, and other similar secular entities are limited to 50% of fire-code capacity, yet houses of worship are limited to fifty people regardless of their fire-code capacities. As a result, the restrictions in the Directive, although not identical to New York's, require attendance limitations that create the same "disparate treatment" of religion. *Id.* at \*2. Because "disparate treatment" of religion triggers strict scrutiny review—as it did in *Roman Catholic Diocese*—we will review the restrictions in the Directive under strict scrutiny. *Id.*

9

The district court never reached the question of whether the Directive survives strict scrutiny review because it thought that then-current law required only rational basis review. Although, "[a]s a general rule," we do "not consider an issue not passed upon below," we have discretion to decide "a purely legal" question where "resolution of the issue is clear and . . . injustice might otherwise result." *Quinn v. Robinson*, 783 F.2d 776, 814 (9th Cir. 1986). We find it necessary to exercise our discretion here, just as the Supreme Court did in *Roman Catholic Diocese*, when it enjoined certain features of an order that had already been replaced.[4]

To survive strict scrutiny review, the Directive "must be 'narrowly tailored' to serve a 'compelling' state interest." *Roman Catholic Diocese*, 2020 WL 6948354, at *2 (quoting *Church of Lukumi*, 508 U.S. at 546). The Directive—although less restrictive in some respects than the New York regulations reviewed in *Roman Catholic Diocese*—is not narrowly tailored because, for example, "maximum attendance at a religious service could be tied to the size of the [house of worship]." *Id.* In other words, instead of a fifty-person cap, the Directive could have, for example, imposed a limitation of 50% of fire-code capacity on houses of worship,

---

[4] The Supreme Court concluded that "injunctive relief [wa]s still called for because the applicants remain[ed] under a constant threat that the area in question [would] be reclassified as red or orange . . . . If that occur[red] again, the reclassification [would] almost certainly bar individuals in the affected area from attending services before judicial relief [could] be obtained." *Roman Catholic Diocese*, 2020 WL 6948354, at *3 (internal citation omitted).

10

like the limitation it imposed on retail stores and restaurants, and like the limitation the Nevada Gaming Control Board imposed on casinos. Therefore, though slowing the spread of COVID-19 is a compelling interest, the Directive is not narrowly tailored to serve that interest. *See id.*

For these reasons, Calvary Chapel has demonstrated a likelihood of success on the merits of its Free Exercise claim. It has also established that the occupancy limitations contained in the Directive—if enforced—will cause irreparable harm, and that the issuance of an injunction is in the public interest. *See id.* at \*3; *Winter*, 555 U.S. at 20. Accordingly, we reverse the district court, instruct the district court to employ strict scrutiny review to its analysis of the Directive, and preliminarily enjoin the State from imposing attendance limitations on in-person services in houses of worship that are less favorable than 25% of the fire-code capacity. The district court may modify this preliminary injunctive relief, consistent with this opinion and general equitable principles. *See Winter*, 555 U.S. at 20. We encourage the district court to act expeditiously in connection with any such modification.

## CONCLUSION

For the reasons above, we reverse the district court and remand for further proceedings. This order shall act as and for the mandate of this court.

REVERSED AND REMANDED.

11