In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-1757

STEPHEN CASSELL and THE BELOVED CHURCH,

*Plaintiffs-Appellants*,

*v.*

DAVID SNYDERS, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 3:20-cv-50153 — **John Z. Lee**, *Judge*.

ARGUED NOVEMBER 12, 2020 — DECIDED MARCH 8, 2021

Before WOOD, HAMILTON, and ST. EVE, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Plaintiffs appeal the May 3, 2020 denial of a preliminary injunction against a now-expired ten-person limit on religious and other gatherings that Illinois imposed to curtail the spread of the coronavirus. The plaintiffs, a Christian church and its pastor, hold weekly in-person worship services attended by approximately eighty people. Pastor Stephen Cassell suspended these services after he received on March 31, 2020 a "Cease and Desist Notice" from the county

health department that threatened penalties under Illinois Executive Order 2020-10, issued March 20, 2020, if the church continued to host in-person gatherings of ten or more people. Pastor Cassell and The Beloved Church filed this lawsuit on April 30, 2020. They sought a preliminary injunction to stop Governor Pritzker and Stephenson County officials (Sheriff David Snyders and Health Administrator Craig Beintema) and Lena Police Chief Steve Schaible from enforcing the ten-person limit against the church.

The plaintiffs contend that the ten-person limit on religious gatherings violated their right to exercise their religion under both the First Amendment and the Illinois Religious Freedom Restoration Act. They also allege that the governor's executive order violated their due process rights under the Fourteenth Amendment and exceeded the governor's powers under the Illinois Emergency Management Agency Act and the Illinois Department of Public Health Act.

Executive Order 10 prohibited public gatherings of more than ten people, with limited exceptions for certain essential activities, but not religious gatherings. See Ill. Exec. Order 2020-10 §§ 1.3, 1.5, 1.12 (Mar. 20, 2020). Since that order was issued, the exponential spread of coronavirus has caused a global pandemic that rages on. When Pastor Cassell received the notice on March 31, 2020, Illinois was reporting a seven-day average of 637 new coronavirus cases per day. *Illinois Coronavirus Map and Case Count*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/interactive/2020/us/illinois-coronavirus-cases.html. As we write this opinion, Illinois is now reporting thousands of new cases each day. *Id.* (last visited Mar. 2, 2021). The virus has killed more than 22,000 people in Illinois alone. *Id.* And across the United States, over 28 million

cases and 514,000 deaths have been confirmed. *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=Top%20Stories& pgtype = Homepage (last visited Mar. 2, 2021). The pandemic is expected to continue until vaccines reach a substantial majority of the population.

Much has changed since the church filed this case on April 30, 2020. By the time the district court heard this case, Executive Order 10 had been replaced by Executive Order 2020-32, which still contained the ten-person limit on religious gatherings. But on May 29, months before plaintiffs filed their appellate brief, the governor issued Executive Order 2020-38, which encouraged a ten-person limit on religious gatherings but removed the mandate to that effect. See Ill. Exec. Order 2020-38, ¶ 4(a). Since then, the governor has continued to adjust regulations to manage risk with a series of executive orders that have all expressly exempted religious gatherings from mandatory restrictions. See Ill. Exec. Order 2020-43 (June 26, 2020); Ill. Exec. Order 2020-55 (Sept. 18, 2020); Ill. Exec. Order 2020-73 (Nov. 18, 2020); Ill. Exec. Order 2021-03 (Jan. 19, 2021). The plaintiffs' complaint challenges the ten-person limit as it stood in April, when it applied to religious gatherings. That's what the district court assessed when it denied a preliminary injunction on May 3, 2020.

We affirm that denial. Intervening authority from the Supreme Court offers plaintiffs a greater prospect for success on the merits of their First Amendment claim than either the district court or we had expected. See *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020). Yet recent Supreme Court authority has also indicated that equitable

considerations weigh against granting a preliminary injunction at this time, when the prospect of irreparable injury to the plaintiffs is very low. See *Danville Christian Academy, Inc. v. Beshear*, 141 S. Ct. 527 (Dec. 17, 2020). In addition, the interests of people who are not parties to this case ("the public interest" in the preliminary injunction balancing) weigh substantially against injunctive relief.

Plaintiffs' remaining claims are unlikely to succeed on the merits, at least in federal court. Their federal procedural due process claim was not presented to the district court and appears to have little merit. Plaintiffs' state-law claims present jurisdictional concerns that cast serious doubt on their ultimate success in federal court. The Eleventh Amendment bars relief against the governor; it may also bar relief against the local defendants. The state-law claims may also be moot as against the local defendants, and most fundamental, all of the state-law claims appear to be poor candidates for a federal court's exercise of its supplemental jurisdiction.

In Part I, we summarize the district court's decision. We explain in Part II the standard for a preliminary injunction and our standard of review and in Part III the balance of the equities on plaintiffs' First Amendment claim. In Part IV, we address the plaintiffs' limited prospects for success on their due process and state-law claims, at least in federal court.

## I. *The District Court's Denial of a Preliminary Injunction*

In a swift and thorough opinion, the district court denied the plaintiffs' request for a preliminary injunction because it found that their claims were unlikely to succeed on their merits and that the equitable balance of harms weighed heavily against them. *Cassell v. Snyders*, 458 F. Supp. 3d 981 (N.D. Ill.

2020). The court found that the plaintiffs' First Amendment and state-law religious freedom claims were unlikely to prevail because elected officials' responses to a pandemic deserve great latitude, *id.* at 993–94, and religious gatherings are not comparable to other activities that were exempted from the ten-person limit, such as grocery shopping. *Id.* at 996–97, 1000–01. As to the other state-law claims, the court explained that the governor did not appear to have exceeded his statutory emergency authority or violated state procedures for closing premises during a public health crisis. *Id.* at 1001–03. The court also said that, in any event, the Eleventh Amendment would bar injunctive relief from a federal court under all the plaintiffs' state-law claims. *Id.* at 999, citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117, 123 n.34 (1984) (holding that state officials, and sometimes county and local officials, are immune from federal injunctions based on state law).

The district court then explained that the equitable balance of harms weighed "heavily against the … preliminary injunction that Plaintiffs seek." *Id.* at 1003. The court stressed that an injunction "would not only risk the lives of the Beloved Church's members, it would also increase the risk of infections among their families, friends, co-workers, neighbors, and surrounding communities." *Id*. "While Plaintiffs' interest in holding large, communal in-person worship services is undoubtedly important, it does not outweigh the government's interest in protecting the residents of Illinois from a pandemic." *Id*.

II.  *The Preliminary Injunction Standard*

A preliminary injunction is "'an exercise of a very far-reaching power, never to be indulged in except in a case

clearly demanding it.'" *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020), quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008); see generally *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (standard for preliminary injunction). "As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992), quoting *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986), and *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–87 (7th Cir. 1984). If these threshold factors are met, the court proceeds to "a balancing phase," *Girl Scouts*, 549 F.3d at 1086, where it "must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Abbott Labs.*, 971 F.2d at 11–12.

In the final analysis, the district court equitably weighs these factors together, "seeking at all times to 'minimize the costs of being mistaken.'" *Id.* at 12, quoting *American Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986). We have often referred to this process as a "sliding scale" approach. *Id.* "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018), quoting *Girl Scouts*, 549 F.3d at 1086, in turn quoting *Roland Machinery*, 749 F.2d at 387. "Where appropriate, this

balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Id.*

Given the need for equitable judgment in these matters, on appeal, we review a district court's decision to grant or deny a preliminary injunction for an abuse of discretion. *Abbott Labs.*, 971 F.2d at 12. The district court "abuses its discretion when it commits a clear error of fact or an error of law." *Id.* at 13. "Absent such errors, we accord a district court's decisions during the balancing phase of the analysis great deference." *Girl Scouts*, 549 F.3d at 1086, citing *Abbott Labs.*, 971 F.2d at 13; see also *Roland Machinery*, 749 F.2d at 392 (same).

While this appeal has been briefed and under advisement, the legal landscape has been shifting as the Supreme Court, this court, and other courts have faced a host of questions arising in our nation's response to the pandemic. Plaintiffs' First Amendment claim has more potential merit than the district court recognized in May 2020, or than we would have recognized before November 25, 2020, when the Supreme Court decided *Roman Catholic Diocese*. On balance, though, we find that Judge Lee did not abuse his discretion in concluding that the equitable balance of harms weighs against granting a preliminary injunction.

III. *The Balance of the Equities*

Parties seeking a preliminary injunction must demonstrate not only likely success on the merits but also that they will suffer irreparable harm if preliminary relief is denied. *Abbott Labs.*, 971 F.2d at 11. Such harm must also be balanced against any harm to the "non-moving party" and "the public

interest," which refers to the interests of people and institutions that are not parties to the case. *Id.* at 11–12. In this case, actual restrictions on plaintiffs' First Amendment rights to exercise their religion freely by worshipping together as they wish certainly count as irreparable harm. *Roman Catholic Diocese*, 141 S. Ct. at 67 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."), quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality). Yet government officials did not officially enforce Executive Order 10 against plaintiffs. Rather, when the plaintiffs filed this lawsuit, the irreparable harm they faced was the threat of enforcement described in the Cease and Desist Notice received on March 31, 2020.

These threats were serious when they were made last spring; they were enough to pressure Pastor Cassell to cancel group worship services, very reluctantly. Credible threats like these can chill First Amendment activity, are not to be treated lightly, and are sufficient to support injunctive relief. See, e.g., *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–72 (1997) (threat of criminal prosecution for transmission of "indecent" material to minors violated First Amendment in part due to law's "obvious chilling effect on free speech"); *Laird v. Tatum*, 408 U.S. 1, 11 (1972) ("this Court has found in a number of cases that constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations"); *Keyishian v. Board of Regents*, 385 U.S. 589, 604 (1967) ("'[T]he threat of sanctions may deter … almost as potently as the actual application of sanctions.' The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against … ."), quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963).

But the plaintiffs no longer face any live threat of enforce-ment—and have not for nine months. Illinois abandoned the ten-person limit on religious gatherings on May 29, 2020. Since then, the governor's executive orders have consistently refrained from limiting the free exercise of religion. See Ill. Exec. Order 2020-38 (May 29, 2020); Ill. Exec. Order 2020-43 (June 26, 2020); Ill. Exec. Order 2020-55 (Sept. 18, 2020); Ill. Exec. Order 2020-73 (Nov. 18, 2020); Ill. Exec. Order 2021-03 (Jan. 19, 2021). The governor preserved this free exercise ex-emption even in Executive Order 73, which imposed height-ened "Tier 3" restrictions during the record surge of cases and hospitalizations in November 2020.

Since November 2020, vaccines have been approved and are beginning to be distributed. And Illinois has chosen to scale back its restrictions. See Ill. Exec. Order 2021-03 (return-ing to regional approach). This most recent order repeats the free exercise exemption and states that the governor going forward does "not intend to rescind these exemptions during the disaster proclamations issued due to COVID-19." *Id.* For the last nine months, no threat of immediate enforcement has loomed over plaintiffs. Illinois' response since May 2020 shows that the prospect of such a threat being renewed is min-imal.

We have considered whether the case should be dismissed as moot. Given the uncertainty about the future course of the pandemic, we are not convinced that these developments have definitively rendered it moot. See *Danville Christian Academy*, 141 S. Ct. at 530 (Gorsuch, J., dissenting from denial) ("[N]o one attempts to suggest this case is moot."); *Roman Catholic Diocese*, 141 S. Ct. at 68 ("It is clear that this matter is not moot."), citing *Friends of the Earth, Inc. v. Laidlaw*

*Environmental Services (TOC), Inc.*, 528 U.S. 167, 189–190 (2000) ("a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur"). But see *Pleasant View Baptist Church v. Beshear*, No. 20-6399, — Fed. App'x. —, 2020 WL 7658397, at *1 (6th Cir. Dec. 21, 2020) (challenge to COVID-19 executive order limiting social gatherings was moot because it recently expired and governor publicly disavowed any intention to renew it), citing *New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1526 (2020), and *Trump v. Hawaii*, 138 S. Ct. 377, 377 (2017), for the proposition that "Once a law is off the books and replaced with a 'new rule' that does not injure the plaintiff, a case becomes moot … ."

While falling short of true mootness, these developments weigh against the need for a preliminary injunction even if the plaintiffs may be likely to succeed on the merits. If it were imposed again now, the earlier ten-person limit on religious gatherings could well violate the Free Exercise Clause. In June 2020, we held the opposite in *Elim Romanian Pentecostal Church v. Pritzker*. 962 F.3d 341, 347 (7th Cir. 2020) ("Illinois has not discriminated against religion and so has not violated the First Amendment … ."), citing *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). But the Supreme Court's summary decision in November in *Roman Catholic Diocese* calls into question our reasoning in *Elim Romanian*, particularly with respect to the sorts of comparisons relevant in showing that restrictions on group meetings discriminate against religion. *Roman Catholic Diocese* held that strict scrutiny applied to a similar ten-person limit in New York because it did not equally extend to commercial activities that seemed to the Court similar in terms of health risk

and less essential than religious worship. 141 S. Ct. at 66–67. The Court then concluded that the ten-person limit would likely not pass strict scrutiny. *Id.* at 67. So in light of *Roman Catholic Diocese*, we do not rely on *Elim Romanian* to reject plaintiffs' claims of discrimination against religious worship.

The Illinois orders at issue here and in *Elim Romanian* resembled the restrictions enjoined in *Roman Catholic Diocese*. See 141 S. Ct. at 66 ("In red zones, no more than 10 persons may attend each religious service … ."). The similarities do not necessarily mean that the plaintiffs here will succeed on the merits of their free-exercise claims. For example, in applying *Roman Catholic Diocese*, the Ninth Circuit recently reached opposite results in two cases addressing different religious restrictions. Compare *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228 (9th Cir. Dec. 15, 2020) (reversing denial of preliminary injunction against Nevada rule that limited indoor religious gatherings to 50 people but allowed other indoor retail and recreational activities to continue at 50% capacity), with *South Bay United Pentecostal Church v. Newsom*, No. 20-56358, 2021 WL 222814 (9th Cir. Jan. 22, 2021) (affirming denial of preliminary injunction against California rule banning all indoor religious services along with recreational activities like restaurants, bowling alleys, and casinos, but allowing grocery stores and other retail establishments to operate indoors at reduced capacity). Even more recently, the Supreme Court summarily stayed portions of the order in *South Bay*, but left other portions in place. See *South Bay United Pentecostal Church v. Newsom*, 592 U.S. —, 141 S. Ct. 716 (Feb. 5, 2021) (enjoining enforcement of complete ban on indoor worship services but allowing enforcement of 25% capacity restrictions and prohibitions on indoor singing and chanting, including in worship services).

These cases show that, as in other contexts that call for narrow tailoring, the fine-grained details governing a public health order's treatment of religious gatherings in comparison with other activities are crucial in assessing its constitutionality under *Roman Catholic Diocese*. Even after the Supreme Court's most recent pronouncement, many questions remain unanswered: "When are such capacity limits permissible, and when are they not? And is an indoor ban never allowed, or just not in this case? Most important—do the answers to those questions or similar ones turn on record evidence about epidemiology, or on naked judicial instinct?" *South Bay*, 592 U.S. at [6] (Kagan, J., dissenting). This adds unpredictability to the narrow-tailoring analysis, which "becomes harder still when officials must guess which restrictions this Court will choose to strike down." *Id.*

Regardless, we need not conduct that fine-tuned analysis here with respect to Executive Orders 10 and 32. Even if the plaintiffs now appear more likely to succeed on the merits of their free exercise claim, there simply is no compelling need for preliminary relief against these long-expired orders, and there is every reason to expect that even if Illinois in the future believes some binding restrictions on worship services are needed, it will act with a close eye on the Supreme Court's latest pronouncements on the subject, including the need for measures closely tailored to meet public health needs.

By way of comparison, the case for emergency injunctive relief in *Roman Catholic Diocese* was much stronger than it is here. There, the challenged New York order was active, and the governor was "regularly chang[ing] the classification of particular areas without prior notice," three times in the seven days before the Supreme Court's order. *Roman Catholic*

*Diocese*, 141 S. Ct. at 68 & n.3. In these circumstances, the Court concluded that "injunctive relief is still called for because the applicants remain under a constant threat that the area in question will be reclassified as red or orange." *Id.* at 68; see also *Calvary Chapel Dayton Valley*, 982 F.3d at 1230 n.1 (finding preliminary relief was still needed where challenged order had expired but had been replaced with similar orders). The situation here is quite different. See *Pleasant View Baptist Church*, 2020 WL 7658397, at *2 (distinguishing an expired and nonrenewed order from order in *Roman Catholic Diocese*).

This case is instead more analogous to *Danville Christian Academy*, 141 S. Ct. 527, where the Supreme Court denied emergency relief. *Danville Christian Academy* was decided less than a month after *Roman Catholic Diocese*. Kentucky's governor issued an order closing K–12 schools on November 18, 2020 and allowing reopening on January 4, 2021. A private religious school and the state attorney general argued that the order was not neutral toward religion because it closed schools (including religious schools) but not other establishments like restaurants, bars, and gyms. The district court issued a preliminary injunction, but the Sixth Circuit stayed the injunction pending appeal. On December 17, 2020, the Supreme Court denied the plaintiffs' application to vacate the stay. The Court did not address the merits. Instead, it stressed the impending expiration of the order, which undermined the plaintiffs' need for emergency relief:

> The Governor's school-closing Order effectively expires this week or shortly thereafter, and there is no indication that it will be renewed … . Under all of the circumstances, especially the timing and the impending expiration of the

Order, we deny the application without preju-
dice to the applicants or other parties seeking a
new preliminary injunction if the Governor is-
sues a school-closing order that applies in the
new year.

141 S. Ct. at 528. Two Justices dissented and confirmed that
the denial of relief was based on the challenged order's im-
pending expiration rather than the merits. See *id.* (Alito, J.,
dissenting from denial) ("[T]he executive order in question
will expire before classes would normally begin next year.
The Court is therefore reluctant to grant relief that, at this
point, would have little practical effect."); *id.* at 530 (Gorsuch,
J., dissenting from denial) ("The majority … instead turns to
an assessment of the equities. Whatever the problems with the
Sixth Circuit's order, it says, we should let this one go because
this case is old news; winter break is coming soon, and the
Governor's decrees will expire in a few weeks, on January 4th.
I would assess the equities differently.").

In this case, the equities weigh even more strongly against
relief. The order in *Danville Christian Academy* was still offi-
cially "in force" when the Court denied relief. *Id.* Here, the
challenged restriction has not been in force for the last nine
months. There is "no indication that it will be renewed," see
*id.* at 527, and in fact there are strong affirmative indications
that it will not be renewed. See Ill. Exec. Order 2021-03 (Jan.
19, 2021) ("I … do not intend to rescind these exemptions dur-
ing the disaster proclamations issued due to COVID-19."). In
a situation like this, there is not, and for months has not been,
an equitable need for a preliminary injunction.

We also remind ourselves and other courts in our circuit
that the scientific uncertainty surrounding the pandemic

further cautions against enjoining state coronavirus responses unless absolutely necessary. The world has not suffered a pandemic this deadly since 1918. See U.S. Centers for Disease Control and Prevention, *1918 Pandemic*, https://www.cdc.gov/flu/pandemic-resources/1918-pandemic-h1n1.html. Governments and citizens have thus been forced to act with imperfect knowledge. It has been difficult to quantify the risks of infection posed by different public activities like worshipping or shopping, how the virus affects different subpopulations, whether hospitals might run out of beds, and to estimate when "herd immunity" might be achieved through vaccination—to list just some examples. Accordingly, while "the Constitution cannot be put away and forgotten," *Roman Catholic Diocese*, 141 S. Ct. at 68, as judges without scientific expertise, we must appreciate these uncertainties and "choose the course of action that will minimize the costs of being mistaken." *American Hosp. Supply Corp.*, 780 F.2d at 593. The pandemic is not a permissible excuse for invidious discrimination, but even in *Roman Catholic Diocese*, the Court recognized: "Members of this Court are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area." 141 S. Ct. at 68. Justice Kavanaugh emphasized this point:

> To be clear, the COVID–19 pandemic remains extraordinarily serious and deadly. And at least until vaccines are readily available, the situation may get worse in many parts of the United States. The Constitution "principally entrusts the safety and the health of the people to the politically accountable officials of the States." *South Bay*, 590 U.S., at —, 140 S. Ct., at 1613 (ROBERTS, C. J., concurring in denial of

application for injunctive relief) (internal quotation marks and alteration omitted). Federal courts therefore must afford substantial deference to state and local authorities about how best to balance competing policy considerations during the pandemic. See *ibid.*

*Id.* at 73–74 (Kavanaugh, J., concurring).

*Roman Catholic Diocese* relied on evidence that the state of New York had both targeted some religious communities for greater restrictions and chosen to allow secular activities that seemed at least as dangerous as group worship. We have not been presented with any evidence of hostile targeting here. In addition, we find it difficult to draw a conclusion of discrimination against religion from Illinois' initial steps and adjustments last spring to begin the enormously complex task of protecting public health in the face of a virus transported by air and by people who have no symptoms, while also allowing truly essential activities to proceed as safely as possible. It is difficult for courts (and governors and public health officials) to know the most appropriate comparisons for evaluating restrictions on religious activities, as shown by the Justices' opinions in *Roman Catholic Diocese* and *South Bay*, our opinion in *Elim Romanian*, and many other court opinions issued over the last ten months.

When balancing the public interest—meaning the interests of those not before the court—courts must also keep in mind that plaintiffs are not asking to be allowed to make a self-contained choice to risk only their own health to worship in-person. A person's ability to make private choices affecting his or her own body and health is fundamental to the concept of individual liberty that our Constitution protects. See, e.g.,

*Griswold v. Connecticut*, 381 U.S. 479 (1965); *Lawrence v. Texas*, 539 U.S. 558 (2003). The plaintiffs here, however, cannot invoke the moral force of the Harm Principle. See John Stuart Mill, *On Liberty*, 9 (1859) ("[T]he only purpose for which power can be rightfully exercised over any member of a civilized community, against his will, is to prevent harm to others."); see also *Declaration of the Rights of Man and of the Citizen*, Art. IV (1789) ("Liberty consists in the freedom to do everything which injures no one else."). As the district court noted, in-person worship services do not increase the risk of disease only for those who choose to take some risk in order to attend. Especially because of the insidious risk of non-symptomatic contagion, exposure to coronavirus in a place of worship can easily spread far beyond the congregation. It can sicken and even kill many others who did not consent to that trade-off.[1]

Cases like this lie within a fraught and evolving intersection of law, science, policy, and politics. The risk of irreparable injury to these plaintiffs is very low and dropping, even if we assume plaintiffs are likely to succeed on their First Amendment claim. We find no abuse of discretion in denying

---

[1] The plaintiffs argue that this risk of harming the public applies equally to other essential activities like grocery shopping, which were not subject to the ten-person limit on gatherings. Basic human needs force almost everyone these days to sacrifice some safety to obtain food and other necessities. Similarly, we all rely on manufacturing and transportation to supply these essential goods. So in choosing to go to the grocery store, it is unlikely that we are imposing risks on strangers that they are not also taking for themselves. This reciprocity simply does not exist when choosing to gather for in-person religious services, despite their importance to those who attend, where the activities may include prolonged close contact and singing and chanting that can spread an airborne virus.

a preliminary injunction, and there is no good reason to re-
mand for issuance of an injunction now.

IV. *The Plaintiffs' Due Process and State-Law Claims are Unlikely
    to Succeed*

The plaintiffs have also failed to show a likelihood of suc-
cess on their federal due process and state-law claims, so
those claims do not support a preliminary injunction. The
plaintiffs' procedural due process claim is forfeited for pur-
poses of a preliminary injunction and appears to lack merit in
any event. The plaintiffs' state-law claims present jurisdic-
tional issues that cast substantial doubt on their likelihood of
success in federal court. We address these in turn.

A. *Procedural Due Process*

On appeal, the plaintiffs assert that the defendants de-
prived them of liberty without minimal procedural protec-
tions guaranteed by the Fourteenth Amendment when they
threatened to close the church without following the hearing
process set out in the Illinois Department of Public Health Act.

The plaintiffs forfeited this claim for purposes of their mo-
tion for a preliminary injunction. The plaintiffs' complaint
framed their due process claim only in explicitly substantive
rather than procedural terms. Moreover, while the plaintiffs
argued before the district court that the defendants ignored
state-law procedures for closing down premises, they did not
make the very different argument that the alleged state-law
procedural violations amounted to federal due process viola-
tions. Understandably then, the district court did not mention
any procedural due process claim. The plaintiffs' attempt to
constitutionalize their state-law procedural argument is thus
forfeited because it is new on appeal. See *Scheidler v. Indiana*,

914 F.3d 535, 540 (7th Cir. 2019) ("A party generally forfeits issues and arguments raised for the first time on appeal."), citing *CNH Indus. Am. LLC v. Jones Lang LaSalle Am. Inc.*, 882 F.3d 692, 705 (7th Cir. 2018).

### B. *State-Law Claims*

The rest of the plaintiffs' claims arise under state law. The plaintiffs' leading state-law claim is that the governor's ten-person limit on religious gatherings violates the Illinois Religious Freedom Restoration Act, which, unlike the First Amendment, requires even generally applicable laws that burden religion to be narrowly tailored to a compelling government interest. See 775 ILCS 35/15. The plaintiffs further assert that the governor's orders exceed the lawful scope of his emergency power under Illinois' Emergency Management Agency Act. These novel and complex state-law claims present at least three federal jurisdictional concerns that, when combined, seriously jeopardize their prospects for success in federal court.

### 1. *Eleventh Amendment Immunity*

First, the Eleventh Amendment may completely bar the plaintiffs' state-law claims. The Eleventh Amendment immunizes state officers from federal injunctions based on state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984). This prevents us from entertaining the plaintiffs' request to enjoin Governor Pritzker from violating the state religious freedom law or misusing his emergency powers. Whether the Eleventh Amendment similarly extends to the local defendants in this case—Sheriff Snyders, Health Administrator Beintema, and Chief Schaible—is not clear on this limited record.

In general, "the Eleventh Amendment does not apply to 'counties and similar municipal corporations.'" *Id.* at 123 n.34, quoting *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 280 (1977). Yet there are situations where even "a suit against officials of a county or other governmental entity is barred" because the requested relief would, in effect, "run[] against the State." *Id.*

Sheriffs like defendant Snyders are often treated as county officials under Illinois law. See *Scott v. O'Grady*, 975 F.2d 366, 370 (7th Cir. 1992). And although some Illinois county agencies are actually arms of the state, see *Carey v. Quern*, 588 F.2d 230, 234 (7th Cir. 1978), there is reason to think Illinois law also defines defendant Beintema as a county official. See 55 ILCS 5/5-25013 (County Public Health Administrators are appointed under the sole discretion of county health boards, rather than a state agency).

Even so, county and local officials can still be treated as state officials for Eleventh Amendment purposes when carrying out non-discretionary duties subject to state policy control. See *Richman v. Sheahan*, 270 F.3d 430, 439–40 (7th Cir. 2001) ("In determining whether the sheriff is an agent of Illinois government when performing particular functions, we have looked to the degree of control exercised by Illinois over the conduct at issue."). This can be a complex and factually intensive inquiry. Compare *Scott*, 975 F.2d at 371 ("Under these circumstances, … Sheriff O'Grady and Deputy Sheriff Branch were not acting as county officials. The county sheriff acts as an arm of the Illinois state judicial system in executing Writs of Assistance and other state court orders. When fulfilling this statutory duty, the sheriff and his deputies must be deemed state officials … ."), with *Ruehman v. Sheahan*, 34 F.3d

525, 528–29 (7th Cir. 1994) (treating Illinois sheriffs as non-immune county officials where challenged warrant-tracking system was designed and implemented by county government, and so did not implicate state policy: "State law requires the Sheriff to arrest the right people but says nothing about how he should do it.").

Accordingly, in this case, whether the Eleventh Amendment immunizes defendants Snyders, Beintema, and Schaible depends on the extent to which they were exercising their own discretion as local officials or instead following state policy orders as part of a coordinated coronavirus response. This fact-intensive issue has received little attention so far in this case. At this juncture, we lack a sufficient factual record of the nature of the local defendants' actions. Without more, the Eleventh Amendment casts a shadow on plaintiffs' state-law prospects for success on the merits in federal court.

### 2. *Mootness Against Local Defendants*

Second, although the plaintiffs' First Amendment claim against the governor is likely not technically moot, the prospect of mootness is greater when it comes to plaintiffs' state-law claims against the local defendants. Even if the Eleventh Amendment does not immunize them, their role in any future threat of enforcement is more attenuated than the governor's. The governor would need to reimpose the ten-person limit on religious gatherings that has been abandoned since May 2020, and the county health department would then have to serve The Beloved Church with a new Cease and Desist Notice with help from the local police. What's more, the local police have disavowed any past or future intention to enforce the ten-person limit against The Beloved Church. They say they were merely performing a ministerial function when delivering the

notice in March. And the county health department claims that, despite writing the notice, it has no authority to enforce the governor's executive orders against the church. It claims the notice merely alerted the church to the possibility of *state-level* enforcement by state health department.

These longer chains of events would need to occur before the church could face future enforcement of a reimposed ten-person limit *by the local defendants*. We therefore wonder if the original, no-longer-operative Cease and Desist Notice remains enough to sustain Article III standing against the local county defendants based on a threat that a new executive order could be enforced through local officials. See, e.g., *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 412–13 (2013) (no standing where plaintiffs failed to prove that, even if injury was imminent, the government would use the specific method of enforcement that plaintiffs challenged; "even if respondents could demonstrate that the targeting of their foreign contacts is imminent, respondents can only speculate as to whether the Government will seek to use § 1881a-authorized surveillance (rather than other methods) to do so"). We do not decide this issue but suggest the district court consider it in future proceedings.

### 3. *Supplemental Jurisdiction*

Third, the novel and complex nature of the state-law claims in this case cautions against deciding them in federal court. The district court dealt with the asserted emergency in this case well in just a few days. We have had more time to consider. The district court should consider the prudence of exercising supplemental jurisdiction over the plaintiffs' state-law claims. The supplemental jurisdiction statute, 28 U.S.C. § 1367(c), provides:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

The first and fourth considerations are relevant here. As to the first, the state religious freedom claim is particularly novel and complex given the demands of narrow tailoring in this context, where scientific uncertainty surrounds a rapidly evolving pandemic. We also find little guidance from the Illinois Supreme Court on how the Illinois Religious Freedom Restoration Act may apply to an emergency situation like this. There are further complications regarding that act's interaction with other Illinois statutes defining the governor's emergency powers. See 20 ILCS 3305/3 (providing three exceptions to governor's emergency power to limit venue capacity, none of which refer to religion). These state laws all serve important purposes, but as applied to this public health emergency, they are in considerable tension with one another. How these state laws and policies and separation of power issues should be balanced and resolved is vital to the state. The state courts are in the best position to address these questions.

Section 1367(c)'s fourth consideration—"other compelling reasons for declining jurisdiction" in "exceptional circumstances"—may also apply. As the Chief Justice and Justice Kavanaugh have emphasized, federal courts should not interfere with elected officials' responses to the pandemic unless necessary:

> The Constitution "principally entrusts the safety and the health of the people to the politically accountable officials of the States." *South Bay*, 590 U. S., at —, 140 S.Ct., at 1613 (ROBERTS, C. J., concurring in denial of application for injunctive relief) … . Federal courts therefore must afford substantial deference to state and local authorities about how best to balance competing policy considerations during the pandemic.

*Roman Catholic Diocese*, 141 S. Ct. at 73–74 (Kavanaugh, J., concurring). So in a case like this, the exceptional circumstances of the pandemic give federal courts reason to think twice before wading into important and difficult state-law issues that the state's own courts have yet to explore. These concerns explain why it was Michigan's Supreme Court that decided a similar case that the plaintiffs rely on here. See *In re Certified Questions from United States Dist. Court*, 2020 WL 5877599 (Mich. Oct. 2, 2020). That case was originally filed in federal court, but the district court chose to certify important state-law issues concerning the governor's authority to the Michigan Supreme Court. *Id.* at *3.

Finally, the limited relief that the plaintiffs could obtain in federal court further suggests that prudence may not require the court to exercise supplemental jurisdiction over the

plaintiffs' state-law claims. In this respect, the case parallels *Pennhurst*, where the Supreme Court pressed the district court to relinquish supplemental jurisdiction over remaining state-law claims against non-immune county officials. Any potential relief would have been incomplete because no state-level defendants could be enjoined. 465 U.S. at 124 ("[A]ny relief granted against the county officials on the basis of the state statute would be partial and incomplete at best. Such an ineffective enforcement of state law would not appear to serve the purposes of efficiency, convenience, and fairness that must inform the exercise of pendent jurisdiction."). The same may be true here, where the most the plaintiffs could obtain from their state-law claims is an injunction against the local defendants, who are not primarily responsible for developing or executing the ten-person limit that the plaintiffs challenge.

All told, these concerns about immunity, mootness, and supplemental jurisdiction cast substantial doubt on whether the district court can and should decide the plaintiffs' state-law claims. These concerns undermine the plaintiffs' ability to prove likely success on the merits of these claims.

*Conclusion*

The district court did not abuse its discretion in denying a preliminary injunction against a limit on religious gatherings that the governor abandoned months ago. In the midst of the coronavirus pandemic, as elected officials adapt to changing threats and needs, federal judges should not invoke the "far-reaching power" of a temporary injunction except in cases "clearly demanding it," *Orr*, 953 F.3d at 501, quoting *Girl Scouts*, 549 F.3d at 1085. "Under all of the circumstances, especially the timing and the … expiration of the Order," this case does not clearly demand a preliminary injunction.

*Danville Christian Academy*, 141 S. Ct. at 528. The plaintiffs may of course seek a new preliminary injunction if the governor issues a new order reimposing the sort of limits that the plaintiffs challenge. *Id.*

AFFIRMED.