**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| KELLY ANN CHAKOV MCDOUGALL, an individual and Trustee; JULIANA GARCIA, an individual; SECOND AMENDMENT FOUNDATION; CALIFORNIA GUN RIGHTS FOUNDATION; FIREARMS POLICY COALITION, INC., *Plaintiffs-Appellants*, v. COUNTY OF VENTURA; BILL AYUB; WILLIAM T. FOLEY; ROBERT LEVIN; VENTURA COUNTY PUBLIC HEALTH CARE AGENCY, *Defendants-Appellees.* | No. 20-56220 D.C. No. 2:20-cv-02927-CBM-AS OPINION |

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted October 18, 2021
Pasadena, California

Filed January 20, 2022

Before: Andrew J. Kleinfeld, Ryan D. Nelson, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge VanDyke;
Concurrence by Judge Kleinfeld;
Concurrence by Judge VanDyke

## SUMMARY[*]

### Second Amendment

The panel reversed the district court's order dismissing, for failure to state a claim, an action alleging that Ventura County's COVID-19 public health orders mandating a 48-day closure of gun shops, ammunition shops, and firing ranges violated plaintiffs' Second Amendment rights.

The panel first held that the Orders' 48-day closure of gun shops, ammunition shops, and firing ranges burdened conduct protected by the Second Amendment, based on a historical understanding of the scope of the Second Amendment right.

In assessing the appropriate level of scrutiny, the panel held that the district court erred by determining that *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), applied to Appellees' Second Amendment claim. The panel held that *Jacobson,* which addressed a substantive due process challenge to a state statute requiring smallpox vaccinations, did not apply here because *Jacobson* did not concern the specific, constitutionally enumerated right at issue, and essentially applied rational basis review. The panel declined to determine whether the Orders were categorically

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

unconstitutional and instead, because the Orders failed to satisfy any level of heightened scrutiny, based its decision on the traditional tiered scrutiny analysis.

The panel held that the Orders' burden on the core of the Second Amendment warranted strict scrutiny—which the Orders failed to satisfy because they were not the least restrictive means to further Appellees' interest, especially when compared to businesses that had no bearing on fundamental rights, yet nevertheless were allowed to remain open. The panel distinguished this case from *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016), which applied intermediate scrutiny in assessing California's 10-day waiting period between purchase and possession of a firearm. The panel held that the Orders at issue here imposed a far greater burden than the 10-day delay at issue in *Silvester*.

The panel held that the Orders also failed intermediate scrutiny given that the County failed to provide any evidence or explanation suggesting that gun shops, ammunition shops, and firing ranges posed a greater risk of spreading COVID-19 than other businesses and activities deemed "essential." Nor did Appellees provide any evidence that they considered less restrictive alternatives for the general public. This could not survive any type of heightened scrutiny where the government bears some burden.

Concurring, Judge Kleinfeld stated that he concurred in the result but wrote separately for two reasons. First, there was no need to reach the question of whether strict scrutiny applied, so he would not. While strict scrutiny may be appropriate, as the majority concluded, nevertheless, the panel should not make more law than was necessary to decide the case. Second, Judge Kleinfeld wished to expand

upon the absence of justification in the record for what the County did.  There was no evidence whatsoever in the record to show why the particular inclusions and exceptions relating to firearms, ammunition, and shooting ranges reasonably fit the purpose of slowing the spread of the COVID-19 virus. The only document the County pointed to as justification was the edict itself, in which its Health Officer recited in the "Whereas" clauses that "social isolation is considered useful" for this purpose.  The County provided no evidence and no justification for why bicycles could be purchased and delivered, for example, but firearms could not even be picked up at the storefront, or for why such outdoor activities as walking, bicycling, and golfing were allowed, but acquiring and maintaining proficiency at outdoor shooting ranges was not.  The County has simply neglected to make a record that could justify its actions.  Neither pandemic nor even war wipes away the Constitution.

Concurring, Judge VanDyke wrote separately to make two additional points.  First Judge VanDyke predicted that this ruling will almost certainly face an en banc challenge because that is what always happens when a three-judge panel upholds the Second Amendment in this Circuit. Second, Judge VanDyke stated that this Circuit's Second Amendment framework is exceptionally malleable and essentially equates to a rational basis review.  Judge VanDyke figured there was no reason why he shouldn't write an alternative draft opinion that would apply this Circuit's test in a way more to the liking of the majority court.  That way, he could demonstrate just how easy it was to reach any desired conclusion under the current framework, and the majority of the court could get a jump-start on calling this case en banc.  To better explain the reasoning and assumptions behind this type of analysis,

Judge VanDyke's alternative draft contains footnotes that offer further elaboration.

## COUNSEL

Raymond M. DiGuiseppe (argued), The DiGuiseppe Law Firm P.C., Southport, North Carolina; Joseph G.S. Greenlee, Firearms Policy Coalition, Sacramento, California; Ronda Baldwin-Kennedy, Law Office of Ronda Baldwin-Kennedy, Agoura Hills, California; for Plaintiffs-Appellants.

Christine Renshaw (argued), Assistant County Counsel; Jeffrey Barnes, Chief Assistant County Counsel; Office of the County Counsel, Ventura, California; for Defendants-Appellees.

## OPINION

VANDYKE, Circuit Judge:

"[T]he right of the people to keep and bear Arms," U.S. Const. amend. II, means nothing if the government can prohibit all persons from acquiring any firearm or ammunition. But that's what happened in this case. Under California's highly regulated framework for firearms, law-abiding citizens can only obtain firearms and ammunition by arriving in-person to government-approved gun and ammunition shops. And after purchasing a firearm, they must wait a minimum of ten days to obtain it (and sometimes much longer). When COVID hit, Ventura County, California issued a series of public health orders (collectively, Orders) that mandated a 48-day closure of gun shops, ammunition shops, and firing ranges. They did this

while allowing other businesses like bike shops to remain open. The Orders also prohibited everyone from leaving their homes other than for preapproved reasons, which did not include traveling to gun or ammunition shops or firing ranges outside the County.

The Orders therefore wholly prevented law-abiding citizens in the County from realizing their right to keep and bear arms, both by prohibiting access to acquiring any firearm and ammunition, and barring practice at firing ranges with any firearms already owned. These blanket prohibitions on access and practice clearly burden conduct protected by the Second Amendment and fail under both strict and intermediate scrutiny. We therefore reverse and remand to the district court.[1]

---

[1] As described below, the County has since withdrawn its blanket prohibitions. Although Appellees do not raise the issue of mootness on appeal, "[w]e have an independent duty to consider *sua sponte* whether a case is moot." *Students for a Conservative Am. v. Greenwood*, 391 F.3d 978 (9th Cir. 2004) (citation omitted). In this case, Appellants sought nominal damages, which "provide the necessary redress for a completed violation of a legal right." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021). Under *Uzuegbunam*, therefore, the fact that Appellants sought damages precludes a mootness claim. *See id.* But even if Appellants had not sought nominal damages, the Orders provided for perpetual extensions, so it cannot be said that there "is no reasonable expectation . . . that the alleged violation will recur" and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018) (citation and internal quotation marks omitted); *see also Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (per curiam) ("[E]ven if the government withdraws or modifies a COVID restriction in the course of litigation, that does not necessarily moot the case."). The mootness exception for wrongs that have been terminated and are unlikely to recur therefore does not apply. *See Fikre*, 904 F.3d at 1037.

# BACKGROUND

Appellants Kelly Ann Chakov McDougall,[2] Juliana Garcia, Second Amendment Foundation, Inc., California Gun Rights Foundation, and Firearms Policy Coalition, Inc. (collectively, Appellants) appeal the district court's dismissal of their complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[3] They claim that the district court erred in concluding that they failed to sufficiently state a plausible claim that the Orders violated their Second Amendment rights. To fully understand the Orders' impact on Appellants' Second Amendment rights, some background on California's regulatory framework is necessary.[4]

## A. California's Extensive Regulatory Framework for Firearms

As we have previously acknowledged, "California has extensive laws regulating the sale and purchase of firearms."

---

[2] After the parties filed their briefs, Plaintiff Donald McDougall passed away and his counsel moved to substitute Kelly Ann Chakov McDougall in his place. We grant the Motion for Substitution of Party (ECF 36).

[3] Appellant Garcia is a County resident. Garcia desired to purchase a firearm but was unable to acquire a Firearm Safety Certificate or purchase a firearm and ammunition due to the Orders. The remaining appellants are non-profit organizations who have numerous members similarly situated to Garcia.

[4] *See Teixeira v. County of Alameda*, 873 F.3d 670, 691 (9th Cir. 2017) (en banc) (Tallman, J., concurring in part and dissenting in part) ("The impact of this county ordinance on the fundamental rights enshrined in the Second Amendment cannot be viewed in a vacuum without considering gun restrictions in California as a whole.").

*Silvester v. Harris*, 843 F.3d 816, 818 (9th Cir. 2016).  Under California law, individuals can only complete the sale, loan, or transfer of a firearm through a licensed firearm dealer (gun shops).  *See* Cal. Penal Code §§ 27545; 28050.  After purchasing, individuals must wait ten days before receipt of the firearm.  *See* Cal. Penal Code §§ 26815, 27540.[5]

With limited exceptions, individuals must also acquire or otherwise transfer and take possession of ammunition from duly licensed firearm and/or ammunition retailers (ammunition shops).  *See* Cal. Penal Code §§ 16151, 30312, 30342, 30370; *see also Rhode v. Becerra*, 445 F. Supp. 3d 902, 912 (S.D. Cal. 2020).[6]

Eligible persons must also obtain a valid Firearm Safety Certificate to acquire firearms, *see* Cal. Penal Code § 26840, which involves taking a written test "generally at participating firearms dealerships and private firearms training facilities."[7]  In addition to taking a written test,

---

[5] Limited exceptions exist for certain purchases, including peace officers and special permit holders.  Cal. Penal Code §§ 26950, 26965.

[6] While the district court in *Rhode* preliminarily enjoined background checks for ammunition sales pursuant to California Penal Code §§ 30370(a)–(d) and § 30352, *see Rhode*, 445 F. Supp. 3d at 910, 957, a motions panel of this court stayed the injunction pending appeal. *Rhode v. Becerra*, No. 20-55437, 2020 WL 9938296 at *1 (9th Cir. May 14, 2020).  A merits panel of this court then ordered the appeal to be held in abeyance pending the issuance of the mandate in *Duncan v. Becerra*, No. 19-55376.  *Rhode v. Rodriquez,* No. 20-55437 (9th Cir. Mar. 19, 2021), ECF No. 82.  In any event, the parties do not dispute that the Orders prevented County residents from engaging in ammunition transactions.

[7] *Becoming A DOJ Certified Instructor And Maintaining Current DOJ Certified Instructor Certification*, STATE OF CALIFORNIA

eligible persons must also "perform a safe handling demonstration . . . . in the presence of a DOJ Certified Instructor[,] . . . [which] are generally performed at the firearms dealership."[8]

Once someone lawfully acquires a firearm, California law generally prohibits them from openly carrying a handgun in public places. Cal. Penal Code § 26350. And those lawfully in possession of a handgun can only carry it while concealed with a license—which can only be obtained (if at all, *see Peruta v. County of San Diego*, 824 F.3d 919, 942 (9th Cir. 2016) (en banc)), by completing an in-person firearms training class that involves "live-fire shooting exercises on a firing range." Cal. Penal Code §§ 25400, 26150(a)(4), 26165(a)(3).

The closure of gun shops, ammunition shops, and firing ranges therefore eliminates the only lawful means to acquire firearms and ammunition within the County, as well as law-abiding County residents' ability to carry handguns in public. As Appellants alleged in their operative Complaint:[9]

> If firearms and ammunition could be
> purchased online like other constitutionally

---

DEPARTMENT OF JUSTICE (last visited Sept. 10, 2021), https://oag.ca.gov/firearms/fscinfo.

[8] *California Firearms Laws Summary*, CALIFORNIA DEPARTMENT OF JUSTICE at 4 (2016), https://oag.ca.gov/sites/all/files/agweb/pdfs/fire arms/pdf/cfl2016.pdf. Pawn shops and immediate family members are exempt from the safe handling demonstration requirement. *Id.*

[9] Given that Appellants have appealed the district court's dismissal of their complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), we accept Appellants' well-pleaded allegations of material fact as true. *See Judd v. Weinstein*, 967 F.3d 952, 955 (9th Cir. 2020).

protected artifacts, such as paper, pens, ink, and technology products that facilitate speech, then individuals could simply purchase what they need and have the items delivered to their doorsteps. But because of an onerous and complicated federal, state, and local regulatory scheme, people in California cannot exercise their Second Amendment right to keep and bear arms without going in person to such . . . businesses—at least once for ammunition and at least twice for firearms.

## B. County Orders

It was against this extensive regulatory backdrop that the County began issuing public health orders in March of 2020 in response to the COVID-19 pandemic.

On March 17, 2020, the County ordered, among other things, that all County residents ages 75 and older "shelter in their place of residence" until April 1. These senior citizens could only leave their residences "to seek medical care, nutrition, or to perform essential work in healthcare or government." These narrow exceptions did not include the acquisition of firearms and ammunition, or practice therewith. "Violation of or failure to comply with [the] Order [constituted] a misdemeanor punishable by fine, imprisonment, or both . . . ."

Three days later, on March 20, the County supplemented its March 17 Order by mandating that "[a]ll persons currently living within [the] County . . . stay at their places of residence, as required by the Governor's Executive Order N-33-20, subject to the exemptions set forth in this Order"

(emphasis added).**[10]**   People of all ages could leave their residences only to exercise or work around their residences (e.g., gardening).   And people not subject to the stay-at-home mandate from the March 17 Order could also leave their residence solely to engage in "Essential Activities and Essential Governmental Functions or Services or to operate or work at Essential Businesses."

The March 20 Order limited the permitted "Essential Activities" to only five categories, which the parties agree did *not* include the purchase of firearms and ammunition, or practice therewith.**[11]**   To emphasize the strict nature of the stay-at-home mandate, the March 20 Order continued, "[a]ll travel . . . except for Essential Travel and Essential Activities[] is prohibited."**[12]**   It further reiterated that only "travel into or out of the County to perform Essential Activities, operate Essential Businesses or to maintain or

---

**[10]** On March 19, Governor Gavin Newsom signed Executive Order N-33-201, directing all California residents to "stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors."

**[11]** The five categories of "Essential Activities" included: (1) "engag[ing] in activities or perform[ing] tasks essential to [the] health and safety" of individuals or their family and household members, (2) "obtain[ing] necessary services or supplies for themselves and their family or household members," (3) "engag[ing] in outdoor activit[ies]," (4) "perform[ing] work providing products and services at an Essential Business or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations;" and (5) "car[ing] for a family member or pet in another household."

**[12]** While "Essential Travel" included "[t]ravel engaged in interstate commerce and otherwise subject to the provisions of the Commerce Clause of the United States Constitution," Appellees have not argued that this provision included the ability to acquire firearms or practice with them outside the County.

provide Essential Governmental Functions or Services [was allowed]."

The March 20 Order also mandated that "[a]ll businesses with a facility in the County, except Essential Businesses, are required to cease all activities at facilities located within the County except Minimum Basic Operations." But it "strongly encouraged" "[a]ll Essential Businesses . . . to remain open." "Essential Businesses" included businesses like hardware stores and laundromats, but not gun shops, ammunition shops, or firing ranges. Notably, the March 20 Order did not provide any explanation for its designation of "Essential Businesses."

The March 20 Order concluded that it would remain in effect until April 19, or "until it is extended, rescinded, superseded or amended in writing by the Health Officer." And "violation of or failure to comply with th[e] Order [wa]s a misdemeanor punishable by fine, imprisonment, or both."

Eleven days later, on March 31, the County supplemented and extended the March 20 Order by, among other things, limiting "the activities of . . . Essential Businesses . . . to the provision of those goods and services essential to the overall intent of the . . . Orders." For example, farmers' markets could sell food and beverages, but not clothing or jewelry. It also added that "a violation of the . . . Orders by a business may subject the business to liability under the state's unfair competition law as well as other civil and criminal penalties." The March 31 Order did not reference gun shops, ammunition shops, or firing ranges—despite an advisory memorandum that had been recently issued by the United States Department of Homeland Security, Cybersecurity & Infrastructure Agency (CISA) listing all those who work in supporting the operation of firearm or ammunition product manufacturers,

retailers, importers, distributors, and shooting ranges as "essential critical infrastructure workers."

Nine days after the March 31 Order, on April 9, the County supplemented its previous Orders by prohibiting gatherings of two or more people outside a single household or living unit.  It also added three new businesses to the "Essential Businesses" list: bicycle repair and supply shops (for online sales only), residential real estate services, and auto dealerships (also only online sales).  Like the March 20 Order, the April 9 Order omitted any rationale as to its designation of these three, but only these three, as newly added "Essential Businesses."

On April 20, in a new order, the County reaffirmed many of its previous prohibitions but added new provisions.  For example, the April 20 Order loosened the requirements for previously designated "Essential Businesses" by allowing in-store bicycle sales.  And it expanded the list of "Essential Businesses" by adding "[b]oat yards and other businesses that provide for safety, security and sanitation of boats stored at docks and marinas."  Gun shops, ammunition shops and firing ranges remained off the "Essential Businesses" list, and the County still omitted any explanation as to its selection of "Essential Businesses."  It also expanded the list of "Essential Activities" to include, among other things, golfing (while not requiring golfing groups to be from the same household).

The April 20 Order, did, however, accommodate people "who initiated the purchase of a firearm at a store located within the County before March 20, 2020 (i.e., the day firearm stores were ordered to be closed . . .)."  For those purchasers only, it allowed for limited actions "necessary to complete the firearm purchase."  These actions must "occur by appointment only, and only the purchaser and one person

on behalf of the store shall be present."  But for the rest of the general public who hadn't purchased a firearm before March 20, "[t]he firearm store shall remain closed."  It provided no explanation as to why the general public could not purchase firearms or ammunition by appointment as well.

Almost three weeks later, on May 7, the County indicated in a new order that various businesses could reopen.  Although the May 7 Order did not explicitly refer to gun shops, ammunition shops, or firing ranges, the County's frequently asked questions (FAQs) indicated that "[w]ith the elimination of the essential business model in the local health order, and reliance on the State health order model for critical infrastructure, the Sheriff and local health officer have determined that the gun stores may fully open to the public provided they implement and register site-specific prevention plans . . . ."  The May 7 Order further defined Essential Activities, in part, as activities necessary "[t]o otherwise carry out activities specifically permitted in this . . . Order."[13]

Thus, from March 20 to May 7, 2020—a total of 48 days—the Orders mandated the closure of gun shops, ammunition shops, and firing ranges throughout the County to the general public, including Appellants.  The closure prohibited County residents from leaving their homes to acquire any firearms or ammunition and maintain proficiency in the use of firearms at firing ranges.  Violations

---

[13] But the May 7 Order still prohibited certain senior citizens from leaving their residence unless it was "necessary to seek medical care or exercise or nutrition or to perform essential work . . . ."  The parties, however, limit the relevant time period at issue in this case to 48 days, from March 20 to May 7, 2020.

of these Orders could subject a person to criminal sanctions and civil liability. The County repeatedly reaffirmed these prohibitions, while simultaneously allowing businesses like hardware stores, laundromats, bicycle shops, and even boat yards to open, and allowing people to leave their homes for activities like golfing. The County never explained its rationale behind the designations of businesses and activities deemed "Essential." The Orders therefore denied anyone who did not possess both a firearm and ammunition on March 19, 2020, from exercising their fundamental rights protected by the Second Amendment until at least May 7.[14]

## C. Procedural History

Appellants filed a lawsuit on March 28, in the midst of the issuance of the first few orders, alleging claims under 42 U.S.C. § 1983 and naming the County as a defendant.[15] In the operative complaint, Appellants alleged that Appellees' "orders, directives, policies, practices, customs, and enforcement actions" violated their rights under the Second Amendment (Second Amendment claim).

After the district court denied two temporary restraining orders (TROs), Appellees filed a motion to dismiss. In evaluating the motion, the district court concluded that

[14] As explained further below, because California imposes a minimum 10-day waiting period on the purchase of firearms, if a County resident had not initiated a firearm purchase before March 20, as a practical matter she was strictly prohibited from obtaining a firearm from March 20 until May 17—almost two months.

[15] In the operative First Amended Complaint, Appellants named the County of Ventura, Ventura County Sheriff Bill Ayub, Ventura County Public Health Care Agency Director William T. Foley, Ventura County Public Health Medical Director and Health Officer Robert Levin, and the Ventura County Public Health Care Agency (collectively, Appellees).

Appellants failed to state a claim under both *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), and our circuit's traditional Second Amendment analysis.  When evaluating Appellants' claims under the traditional tiered-scrutiny analysis, the district court first assumed that the Orders burdened Second Amendment conduct, and then determined that the Orders "do not substantially burden the core right of the Second Amendment" so "intermediate scrutiny is appropriate."  Applying intermediate scrutiny, the district court ultimately concluded that the Orders constituted a "reasonable fit between the County's objective of slowing the spread of COVID-19 and the temporary closure of non-essential businesses, including firearms retailers."  The district court therefore granted the motion to dismiss.  Appellants appeal that order and judgment.

## STANDARD OF REVIIEW

"We review de novo an order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, accepting as true all well-pleaded allegations of material fact and construing those facts in the light most favorable to the non-moving party."  *Judd*, 967 F.3d at 955.  "[D]ismissal is affirmed only if it appears beyond doubt that [the] plaintiff can prove no set of facts in support of its claims which would entitle it to relief."  *City of Almaty v. Khrapunov*, 956 F.3d 1129, 1131 (9th Cir. 2020) (citation, internal alternations, and quotation marks omitted).  "It is axiomatic that the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted."  *McDougal v. County of Imperial*, 942 F.2d 668, 676 n.7 (9th Cir. 1991) (citation, internal alterations, and quotation marks omitted).

**DISCUSSION**

As noted above, this case asks us to decide whether the Orders' closure of gun shops, ammunition shops, and firing ranges—which effectively prohibited any lawful acquisition of firearms and ammunition within the County for at least 48 days—violates the Second Amendment. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Like most circuits, "we have adopted a two-step inquiry for assessing whether a law violates the Second Amendment." *Mai v. United States*, 952 F.3d 1106, 1113 (9th Cir. 2020); *see also Jackson v. City and County of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014). "This test (1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *Mai*, 952 F.3d at 1113 (citation and internal quotation marks omitted). "[T]his inquiry bears strong analogies to the Supreme Court's free-speech caselaw." *Jackson*, 746 F.3d at 960.

As discussed below, the Orders' effective prohibition on all access to and the practice of firearms at firing ranges throughout the County clearly burdens conduct protected by the Second Amendment. And because *Jacobson* does not concern the specific, constitutionally enumerated right at issue here, and essentially applied rational basis review, it does not apply. Instead, the severity of the Orders' burden warrants strict scrutiny—which the Orders fail to satisfy because they are not the least restrictive means to further Appellees' interest, especially when compared to businesses that have no bearing on fundamental rights, yet nevertheless were allowed to remain open. And even if intermediate

scrutiny was the appropriate standard of review, Appellees failed to show how the Orders satisfied it given their complete omission of any explanation as to why gun shops, ammunition shops, and firing ranges posed any more of a risk than other non-Constitutionally protected activities that were deemed "essential" and allowed to remain open.

### 1. The Orders Burden Conduct Protected by the Second Amendment.

We must first decide whether the Orders' 48-day closure of gun shops, ammunition shops, and firing ranges "burdens conduct protected by the Second Amendment, based on a historical understanding of the scope of the Second Amendment right." *Jackson*, 746 F.3d at 960 (citations, internal alteration, and quotation marks omitted). "To determine whether a challenged law falls outside the historical scope of the Second Amendment, we ask whether the regulation is [1] one of the presumptively lawful regulatory measures identified in *Heller*, or [2] whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Id.* (internal citations and quotation marks omitted). The "presumptively lawful regulatory measures identified in *Heller*" are "well-defined and narrowly limited." *Id.* (citation and internal quotation marks omitted).

Neither of these two threshold inquiries are met here. First, no party argues that a 48-day closure of all gun shops, ammunition shops, and firing ranges in the County is one of *Heller*'s "presumptively lawful regulatory measures." *Id.* Nor could they, as nothing in *Heller* suggests that a *complete and total ban* on the commercial sale of all arms and ammunition implicates the "well-defined and narrowly

limited" presumptively lawful categories.  *See id.*; *see also District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008).

Second, the record does not include persuasive historical evidence establishing that the Orders impose prohibitions that fall outside the Second Amendment's historical scope. *See Jackson*, 746 F.3d at 960, 962; *see also Teixeira*, 873 F.3d at 682 ("[D]etermining the scope of the Second Amendment's protections requires a textual and historical analysis of the amendment." (citation omitted)).  Instead, *Heller*'s exhaustive textual and historical Second Amendment analysis—as well as our court's own caselaw—reveal that the ability to acquire firearms and ammunition, and maintain proficiency in their use at firing ranges, falls well within the Second Amendment's historical scope.  *See Heller*, 554 U.S. at 582 ("[T]he most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"); *id.* at 594 ("[Colonists] understood the right to enable individuals to defend themselves."); *id.* at 617–18 ("[T]o bear arms implies something more than the mere keeping; it implies the learning to handle and use them[;] . . . it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." (quoting from judge and professor Thomas Cooley's 1880 work, *General Principles of Constitutional Law*); *id.* at 619 ("Some general knowledge of firearms is important to the public welfare; because it would be impossible, in case of war, to organize promptly an efficient force of volunteers unless the people had some familiarity with weapons of war." (quoting B. Abbott, *Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land* 333 (1880))); *Teixeira*, 873 F.3d at 686 ("The British embargo and the colonists' reaction to it suggest . . . that the Founders were aware of the need to preserve citizen *access* to firearms in light of the risk that a strong government would use its power

to disarm the people."). Indeed, a complete ban on the ability to acquire arms and ammunition, and the closure of all firing ranges, renders the right to keep and bear arms "hardly . . . worth the paper it consumed." *Heller*, 554 U.S. at 609 (citation omitted).

While Appellees cite *Silvester* in arguing that California has a "long history of delaying possession of firearms without impinging on the Second Amendment," California's historical delays were far shorter than the 48-day mandated closure at issue here—which actually amounts to a 58-day delay for the possession of firearms when California's mandatory 10-day waiting period between purchase and possession is added to the County's 48-day ban. *See Silvester*, 843 F.3d at 823–24. Also important is the fact that unlike *Silvester*—which had clearly established timelines for the delays—the delays here were indefinite and fluid. And even in *Silvester* we assumed without deciding that the challenged 10-day waiting period as applied to appellants in that case fell within Second Amendment's historical scope. *Id.* at 826–27. Appellees' lack-of-burden argument fails. "Because [the Orders] . . . are not part of a long historical tradition of proscription," we "conclude that [the Orders] burden[] rights protected by the Second Amendment." *Jackson*, 746 F.3d at 963 (internal citation and quotation marks omitted).

## 2.  The Orders Fail Under Any Level of Heightened Scrutiny.

Because we determine that the Orders burden conduct protected by the Second Amendment, we "proceed to the second step of the Second Amendment inquiry to determine the appropriate level of scrutiny." *Id.* at 960. "When ascertaining the appropriate level of scrutiny, just as in the First Amendment context, we consider: (1) how close the

law comes to the core of the Second Amendment right and (2) the severity of the law's burden on the right." *Id.* at 960–61 (citation and internal quotation marks omitted). "In weighing the severity of the burden, we are guided by a longstanding distinction between laws that regulate the manner in which individuals may exercise their Second Amendment right, and laws that amount to a total prohibition of the right." *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018).

"The result is a sliding scale. A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny." *Silvester*, 843 F.3d at 821 (pointing to *Heller* as an example). "A law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny." *Id.* "If a challenged law does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right, the court may apply intermediate scrutiny." *Id.* (citation, internal alteration, and quotation marks omitted). But rational basis review is not appropriate. *See U.S. v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013). In determining the appropriate level of heightened scrutiny, "we are . . . guided by First Amendment principles." *Jackson*, 746 F.3d at 961.

Given that *Jacobson* does not concern a specific, constitutionally enumerated right and essentially applied rational basis review, *Jacobson* does not apply. Instead, the Orders' severe burden on the core of the Second Amendment right warrants strict scrutiny. And because the Orders are not the least restrictive means available, they fail to satisfy strict scrutiny's high standard. But even if intermediate

scrutiny applied, Appellees have failed to satisfy their burden of showing a reasonable fit.

### a.   Jacobson *Does Not Apply.*

Over 115 years ago, the Supreme Court in *Jacobson* addressed whether a state statute requiring smallpox vaccinations violated "the inherent right of every freeman to care for his own body and health in such way as to him seems best." 197 U.S. at 26.  The defendant in *Jacobson* structured his claim as a substantive due process challenge emanating from the Fourteenth Amendment; no specific enumerated right was at issue.[16]  *Id.* at 14, 25–26.  The Court began by discussing the government's general police power, noting that "[t]he mode or manner in which [local administrations choose to safeguard public health and safety] . . . is within the discretion of the state, subject, of course . . . only to the condition that no rule prescribed by a state . . . shall contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument." *Id.* at 25. "A local enactment or regulation," the Court continued, "even if based on the acknowledged police powers of a state, *must always yield in case of conflict* with the exercise by the general government of any power it possesses under the Constitution, *or with any right which that instrument gives or secures*." *Id.* (emphasis added).

After discussing well-established principles of police power, the Court reasoned that "the [state] legislature . . .

---

[16] *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring) ("Jacobson claimed that he possessed an implied 'substantive due process' right to 'bodily integrity' that emanated from the Fourteenth Amendment and allowed him to avoid not only the vaccine but *also* the $5 fine (about $140 today) and the need to show he qualified for an exemption." (citation omitted)).

required the inhabitants of a city or town to be vaccinated only when, in the opinion of the board of health, that was necessary for the public health or the public safety." *Id.* at 27. Given the general deference afforded to the legislature, the Court determined that legislative action is only unconstitutional "if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 31. Because the state statute at issue satisfied neither of these two prongs, the Court concluded that the statute did not "invade[] any right secured by the Federal Constitution." *Id.* at 31, 38. Multiple jurists and legal commentators have likened this analysis by the *Jacobson* Court to what we now call rational basis review.[17]

In the intervening century since *Jacobson*, the Supreme Court has repeatedly determined that some level of heightened scrutiny applies when evaluating laws implicating specific, enumerated constitutional rights. *See Heller*, 554 U.S. 628 n.27 ("[The rational basis test] could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of

---

[17] *See, e.g.*, *Roman Cath. Diocese*, 141 S. Ct. at 70 (Gorsuch, J., concurring) ("Although *Jacobson* pre-dated the modern tiers of scrutiny, this Court essentially applied rational basis review to . . . Jacobson's challenge . . . ."); *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 129 (6th Cir. 2020) (inferring that *Jacobson* presented a rational basis review); Erwin Chemerinsky & Michele Goodwin, *Civil Liberties in a Pandemic: The Lessons of History*, 106 Cornell L. Rev. 815, 829 (2021) ("From the perspective of today, it is striking how much *Jacobson* used the language of rational basis review, although that as a formal test was not formulated until much later by the Supreme Court.").

speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms.").  Regarding the Second Amendment, the Supreme Court has explicitly determined that rational basis review does *not* apply, reasoning that "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."  *Id.*  Our court has reiterated that "[l]aws burdening Second Amendment rights must withstand more searching scrutiny than rational basis review."  *Mai*, 952 F.3d at 1115 (citation omitted).

The Supreme Court has also repeatedly affirmed that heightened-scrutiny requirements still apply during times of crises.  In several recent cases evaluating public health orders issued in response to the COVID pandemic, the Supreme Court applied strict scrutiny and ignored *Jacobson* entirely.  *See Tandon*, 141 S. Ct. at 1296; *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717–18 (2021) (Statement of Gorsuch, J.); *Roman Cath. Diocese*, 141 S. Ct. at 67.  The only writing from the Court pertaining to COVID-related government orders that relied on *Jacobson* was Chief Justice Roberts's lone concurrence in *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in the denial of application for injunctive relief), but even he has distanced himself from *Jacobson* in more recent writings.  *See Roman Cath. Diocese*, 141 S. Ct. at 75–76 (Roberts, C.J., dissenting).  And when evaluating other public health orders issued in response to COVID-19, this court has similarly ignored *Jacobson* and applied the tiered-scrutiny analysis.  *See, e.g.*, *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1234 (9th Cir. 2020).  This makes sense: As the Supreme Court has repeatedly indicated, national crises do

not water down the application of Constitutional rights—instead, the need to protect those rights is especially acute during those times.  *See S. Bay United Pentecostal Church*, 141 S. Ct. at 718 (Statement of Gorsuch, J.) ("Even in times of crisis—perhaps *especially* in times of crisis—we have a duty to hold governments to the Constitution.").

*Jacobson*'s rational basis review of a substantive due process claim therefore renders it inapplicable here. "*Jacobson . . . .* involved an entirely different mode of analysis, an entirely different right, and an entirely different kind of restriction." *Roman Cath. Diocese*, 141 S. Ct. at 70 (Gorsuch, J., concurring).  Where *Jacobson* concerned a substantive due process claim that traditionally warrants rational basis review absent suspect classifications, *id.*, Appellants bring a Second Amendment claim that traditionally warrants heightened scrutiny.  Even *Jacobson* itself correctly recognized that police powers "must always yield in case of conflict . . . with any right which [the Constitution] gives or secures."  197 U.S. at 25.  And where the challenged restriction at issue in *Jacobson* allowed for viable alternatives to avoid the alleged harm, *see Roman Cath. Diocese*, 141 S. Ct. at 71 (Gorsuch, J., concurring), the Orders at issue here effectively imposed a 48-day complete ban on acquiring firearms and ammunition, and practicing with firearms at firing ranges.  "Nothing in *Jacobson* purported to address, let alone approve, such serious and long-lasting intrusions into settled constitutional rights." *Id. Jacobson* is inapplicable both on the facts and the law.[18]

---

[18] Moreover, since *Roman Catholic Diocese*, several courts have followed the Supreme Court's lead and ignored *Jacobson* in analyzing the constitutionality of public health orders.  *See, e.g., Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020) ("[The] reliance on

### b. We Do Not Decide That the Orders Are Categorically Unconstitutional.

Although we determine that the Orders warrant heightened scrutiny, we decline to determine whether the Orders are categorically unconstitutional. *See Silvester*, 843 F.3d at 821 ("A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny."). A 48-day closure of all gun shops, ammunition shops, and firing ranges throughout the County—which effectively forecloses all available means to acquire firearms and ammunition and practice with firearms at firing ranges—would seem to "amount[] to a destruction of the Second Amendment right," and therefore be categorically unconstitutional. *Jackson*, 746 F.3d at 961 (citation and internal alteration omitted); *see also Heller*, 554 U.S. at 630 (determining that D.C.'s "requirement . . . that firearms in the home be rendered and kept inoperable at all times . . . . makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence

---

*Jacobson* was misplaced."); *Calvary Chapel Dayton Valley*, 982 F.3d at 1232 (applying strict scrutiny to First Amendment claims); *Northland Baptist Church of St. Paul, MN v. Walz*, 530 F. Supp. 3d 790, 811 (D. Minn. 2021) ("Based on the Supreme Court's recent application of traditional tiers of constitutional scrutiny in *Roman Catholic Diocese*, the Court concludes that *Jacobson* does not replace the traditional tiers of constitutional scrutiny."). And our determination here that *Jacobson* does not apply when evaluating fundamental rights aligns with at least one sister circuit that has reached a similar conclusion. *See Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020) ("*Jacobson* predated the modern constitutional jurisprudence of tiers of scrutiny, was decided before the First Amendment was incorporated against the states, and did not address the free exercise of religion." (citation and internal quotation marks omitted)).

unconstitutional."). But because the Orders fail to satisfy any level of heightened scrutiny, we base our decision on the traditional tiered scrutiny analysis.

### c.  *Strict Scrutiny Applies.*

Because *Jacobson* does not apply, we must determine which level of heightened scrutiny applies. As we have previously determined, "[a] law that [1] implicates the core of the Second Amendment right and [2] severely burdens that right warrants strict scrutiny." *Silvester*, 843 F.3d at 821. Both of these requirements are met here.

First, the Orders "implicate[d] the core of the Second Amendment right" because they foreclosed the ability to acquire arms and ammunition and maintain proficiency in the use of firearms—rights which an en banc panel of this court has repeatedly acknowledged are "necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira*, 873 F.3d at 677; *see also id.* ("As with *purchasing ammunition* and *maintaining proficiency in firearms use*, the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the *ability to acquire arms*." (emphases added) (citation and internal quotations omitted)); *see also id.* at 680 ("[G]un buyers have no right to have a gun store in a particular location, *at least as long as their access is not meaningfully constrained*." (emphasis added)); *id.* at 682 ("Commerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense . . . .").[19] If these rights are

_____

[19] In *Teixeira*, an en banc panel of our court determined, among other things, that the plaintiffs failed to state a claim that a county zoning ordinance prohibiting firearm sales in certain areas "impedes any resident of [that county] who wishes to purchase a firearm from doing

"necessary to the realization of the core Second Amendment rights," *id.* at 677, then a fortiori they must "implicate[] the core of the Second Amendment right." *Silvester*, 843 F.3d at 821.

Second, the Orders' mandated closure of all gun shops and firing ranges throughout the County "severely burdens that right" by foreclosing altogether County residents' ability to acquire firearms or ammunition or maintain proficiency in their use at firing ranges. As noted above, under California's extensive firearm regulations, the Orders prohibited County residents from the only lawful means of acquiring firearms and ammunition—and then prohibited those residents from leaving their homes to acquire those items elsewhere. This court has already observed that "an

---

so." 873 F.3d at 673. In evaluating the claim, the panel repeatedly referred to the *right to access firearms, ammunition, and firing ranges* when reasoning that the zoning ordinance did not meaningfully impede on those rights. *Id.* at 677–78. In emphasizing the zoning ordinance's lack of burden on the Second Amendment, the panel contrasted the Seventh Circuit's decision in *Ezell v. City of Chicago*, 846 F.3d 888 (7th Cir. 2017), where "Chicago's zoning regulations . . . so severely limited where shooting ranges may locate that *no* publicly accessible shooting range . . . existed in Chicago." *Teixeira*, 873 F.3d at 679 (citation, internal alterations, and quotation marks omitted). "No analogous restriction on the ability of . . . [c]ounty residents to purchase firearms can be inferred from the complaint in this case." *Id.* The panel therefore concluded that "gun buyers have no right to have a gun store in a particular location, *at least as long as their access is not meaningfully constrained.*" *Id.* at 680 (emphasis added).

Under *Teixeira*'s rationale, this case is more like the *Ezell* cases than *Teixeira*. The Orders prevented all County residents from acquiring firearms and ammunition and maintaining the proficiency of their use at firing ranges. Just as in the *Ezell* cases, the Orders therefore squarely prohibited the very type of meaningful access that the *Teixeira* en banc panel warned against. *See id.* at 680, 688.

overall ban on gun sales would be untenable under *Heller*, because a total prohibition would *severely* limit the ability of citizens to *acquire* firearms," *Teixeira*, 873 F.3d at 688 (first emphasis added) (citation omitted)—which obviously triggers strict scrutiny.  As Judge Tallman noted in *Teixeira*, "[a]ll would agree that a complete ban on the sale of firearms and ammunition would be unconstitutional."  *Teixeira*, 873 F.3d at 693 (Tallman, J., concurring in part and dissenting in part).  Consistent with this court's prior hypothetical discussion of the very type of "complete ban" at issue here, strict scrutiny applies.

In arguing against the application of strict scrutiny, Appellees primarily rely on *Silvester* and its holding that California's 10-day waiting period between purchase and possession of a firearm warranted intermediate scrutiny.  In determining the applicable level of scrutiny, the *Silvester* panel reasoned that the contested regulation "simply requires [the plaintiffs] to wait the incremental portion of the waiting period that extends beyond the completion of the background check."  843 F.3d at 827.  "The waiting period [also] does not prevent any individual from owning a firearm . . . ."  *Id.*  Given the "very small" effect of the waiting period on the plaintiffs—who had already passed the background check within the ten days—and the fact that "[t]here is . . . nothing new in having to wait for the delivery of a weapon," the *Silvester* panel determined that the challenged regulation did not place a "substantial burden on a Second Amendment right" and therefore warranted intermediate scrutiny.  *Id.*

But *Silvester* is inapplicable here for at least three reasons.  First, *Silvester* concerned *no more than* a 10-day waiting period—nearly five times shorter than the Orders' 48-day effective ban on firearm and ammunition sales at issue here.  And for County residents who had not yet

purchased a firearm before the Orders took effect, the 48-day ban here was actually exacerbated by the 10-day waiting period itself, resulting in a total ban of a *58 days*—essentially two months.  Moreover, the delay at issue in *Silvester* was finite—the plaintiffs only challenged the "incremental period" between the passing of a background check and possessing the purchased firearm, which only amounted to no more than 10 days.  But here, each Order promised that it would remain effect until a certain date (which the County extended) *or* "until it is extended, rescinded, superseded, or amended in writing by the Health Officer."[20]  In other words, the ban on protected Second Amendment activities would continue until the government said it didn't.  The 10-day waiting period at issue in *Silvester* was therefore much less restrictive than the uncertain but eventual 48-day ban at issue here.

Second, the appellants in *Silvester* already possessed at least one firearm they could use for self-defense.  They were seeking to avoid the 10-day waiting period when purchasing *subsequent* firearms.  843 F.3d at 818–19.  But the Orders at issue here prevented County residents who owned no firearm *at all* before March 20, 2020, from obtaining any firearm whatsoever for effectively two months, right in the middle of a global crisis.  Denying the ability to acquire a firearm and ammunition *at all* is fundamentally different from waiting a short time to receive an *additional* firearm.  There is a very real difference between a short, defined waiting period to purchase an *additional* firearm, versus a two-

---

[20] While Appellees also argue that the Orders were "in effect for a finite period—from March 20 through May 7," it is only when reviewing the Orders with the benefit of hindsight that it appears finite.  The text of the Orders allowed for perpetual extensions.

month ban on purchasing any firearm, ammunition, or otherwise exercising your Second Amendment rights.

Third, *Silvester*'s rationale turned on the government's claimed interest in a "cooling off" period, which is not at issue here.  Here, the Orders were the County's response in a temporary time of crisis.  Appellees urge that the temporary nature somehow diminishes the burden on the Second Amendment, but "[b]oth this court and the Supreme Court have repeatedly held that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (citation and internal quotation marks omitted).  Because First Amendment principles guide the analysis of the burden's severity in the Second Amendment context, *see Jackson*, 746 F.3d at 961, there is no reason that the loss of Second Amendment freedoms even for "minimal periods of time" would not likewise constitute irreparable injury.

This is especially true in the Second Amendment context, where the need for armed protection in self-defense can arise at a moments' notice and without warning.  People don't plan to be robbed in their homes in the dead of night or to be assaulted while walking through city streets.  It is in these unexpected and sudden moments of attack that the Second Amendments' rights to keep and bear arms becomes most acute.  As *Heller* noted, the Second Amendment is designed to preserve and foster "the right of self-preservation," which "permit[s] a citizen to repel force by force when the intervention of society in his behalf, may be too late to prevent an injury."  *Heller*, 554 U.S. at 595

(internal alterations and quotation marks omitted) (quoting 1 Blackstone's Commentaries at 145–146, n.42 (1803)).[21]

The acute need for Second Amendment rights during temporary crises was well-understood by our Founders. *See Teixeira*, 873 F.3d at 686 (acknowledging that the Second Amendment was "meant to be a strong moral check against the usurpation and arbitrary power of rulers, and as a necessary and efficient means of regaining rights when *temporarily* overturned by usurpation." (emphasis added) (citation omitted)). Modern society agrees, as firearm and ammunition sales have soared during the recent pandemic.[22] But if the government suspends these rights during times of crises, the Second Amendment itself becomes meaningless when it is needed most—especially to the victims of attacks.

The Orders imposed a far greater burden than the 10-day delay at issue in *Silvester*. Their effective ban on the

---

**21** This is particularly true in these turbulent times of rising crime rates and mass police resignations due to low morale and the onslaught of legislative reform. *See, e.g.*, Eric Westervelt, *Cops Say Low Morale And Department Scrutiny Are Driving Them Away From The Job*, NPR (June 24, 2021), https://www.npr.org/2021/06/24/1009578809/cops-say-low-morale-and-department-scrutiny-are-driving-them-away-from-the-job ("In many places, police morale has plunged and retirements and resignations have soared. . . . And the timing of these staffing problems couldn't be worse: multiple cities are seeing startling increases in shootings and murders . . . .").

**22** Martha Bellisle, *Ammunition shelves bare as U.S. gun sales continue to soar*, AP News (July 31, 2021), https://apnews.com/article/sports-business-health-coronavirus-pandemic-gun-politics-86e61939eb4ae1230e110ed6d7576b70 ("The COVID-19 pandemic, coupled with record sales of firearms, has fueled a shortage of ammunition in the United States that's impacting law enforcement agencies, people seeking personal protection, recreational shooters and hunters—and could deny new gun owners the practice they need to handle their weapons safely.").

acquisition of firearms and ammunitions, and closure of all firing ranges where County residents can safely maintain their proficiency in the use of firearms, severely burdens the core of the Second Amendment right.  Strict scrutiny applies.

### d.   The Orders Fail Under Strict Scrutiny.

The Orders cannot survive strict scrutiny.  "Under that standard, the regulation is valid only if it is the least restrictive means available to further a compelling government interest."  *Berger v. City of Seattle*, 569 F.3d 1029, 1050 (9th Cir. 2009) (en banc).

The Orders attempt to "[s]tem[] the spread of COVID-19," which "is unquestionably a compelling interest." *Roman Cath. Diocese*, 141 S. Ct. at 67.  But the recent Supreme Court COVID cases compel the conclusion that the Orders are not the least restrictive means to further this compelling interest.  The complete closure of all gun shops, ammunition shops, and firing ranges is "far more restrictive than any COVID-related regulations that have previously come before the [Supreme] Court," as those cases only concerned regulations *limiting the capacity* at activities that implicated fundamental rights, not an *outright ban* of those activities altogether.  *Roman Cath. Diocese*, 141 S. Ct. at 67 (citing *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (2020) (directive limiting in-person worship services to 50 people); *S. Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Executive Order limiting in-person worship to 25% capacity or 100 people, whichever was lower)).  "[T]here are [also] many other less restrictive rules that could be adopted to minimize the risk" of allowing gun shops, ammunition shops, and firing ranges to remain open. *Roman Cath. Diocese*, 141 S. Ct. at 67.  Among other things, the County could have opened gun shops, ammunition shops, and firing ranges on an appointment-only basis, just

like it eventually did for people who purchased a firearm before the Orders took effect.  *See id.* (determining that the public health orders failed to satisfy strict scrutiny in part because "[n]ot only is there no evidence that the applicants have contributed to the spread of COVID-19 but there are many other less restrictive rules that could be adopted to minimize the risk").

The Orders' discriminatory impact on gun and ammunition shops also emphasizes that they were *not* "the least restrictive means available to further a compelling government interest." *Berger*, 569 F.3d at 1050.  Just like in *Roman Catholic Diocese*, the Orders allowed "essential" businesses like bicycle repair shops and hardware stores to remain open but forced venues that provide access to core fundamental liberties—in this case, Second Amendment rights—to close.  *See Roman Cath. Diocese*, 141 S. Ct. at 69 (Gorsuch, J., concurring) (noting that New York City's designation of "essential businesses" included hardware stores and bicycle repair shops, among other businesses).  In this somewhat unique scenario where governments are grappling with a global pandemic, the risk of gun shops, ammunition shops, and firing ranges remaining open have nothing to do with the dangers typically associated with firearms.  Instead, just as in the recent Supreme Court COVID cases involving religious liberty, all activities open to the public in the County essentially pose the same risk of furthering the spread of COVID by way of facilitating continued public interaction.  *See Tandon*, 141 S. Ct. at 1296 ("Comparability is concerned with the risks various activities pose, not the reasons why people gather.").  And there is nothing in the record suggesting that gun shops, ammunition shops, or firing ranges posed a higher risk of spreading COVID than, say, bicycle shops or hardware stores.

The governments' designation of "essential" businesses and activities reflects a government-imposed devaluation of Second Amendment conduct in relation to various other non-Constitutionally protected activities during times of crises, irrespective of any of the unique dangers presented by firearms, ammunition, or firing ranges. Such devaluation directly undermines the strong protections the Constitution was designed to protect, even *through* the "various crises of human affairs." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819) (emphasis omitted). The Orders' discriminatory denigration of fundamental liberties reveals that they are not the least restrictive means available, further demonstrating their inability to survive strict scrutiny. *Roman Cath. Diocese*, 141 S. Ct. at 67.

Ultimately, the issue boils down to the County's designation of "essential" versus "non-essential" businesses and activities. While courts should afford some measure of deference to local policy determinations, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. When a government completely bans all acquisition of firearms and ammunition by closing gun shops, ammunition shops, and firing ranges, it's one of those off-limits policy choices squarely contemplated by *Heller*. *See id.* at 630. The Orders cannot satisfy strict scrutiny.

### e.   *The Orders Also Fail Intermediate Scrutiny.*

Even if strict scrutiny did not apply, the Orders would fail to satisfy intermediate scrutiny. "To satisfy intermediate scrutiny, the government's statutory objective must be significant, substantial, or important, and there must be a reasonable fit between the challenged law and that objective." *Mai*, 952 F.3d at 1115 (citation and internal quotation marks omitted). "In considering whether [the

challenged law] withstands intermediate scrutiny, we must first define the governmental interest served by [the challenged law], and determine whether it is substantial." *Jackson*, 746 F.3d at 968–69.

Here, as noted above, the Orders' stated intent was to "ensure that the maximum number of persons stay in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the maximum extent possible." The overall intent of slowing the spread of COVID-19 is a substantial government interest, *see Roman Cath. Diocese*, 141 S. Ct. at 67, so the Orders satisfy the first prong of intermediate scrutiny.

But Appellants have failed to show that the Orders reasonably fit the challenged objective. This circuit has sometimes loosely applied the "reasonable fit" prong and only required that the challenged regulation promote a substantial government interest that would be achieved less effectively absent the regulation. *See, e.g.*, *Mai*, 952 F.3d at 1116 (citation omitted); *United States v. Singh*, 979 F.3d 697, 725 (9th Cir. 2020) (citation omitted). Still, a majority of judges in a recent en banc panel also reaffirmed that reasonable fit in the Second Amendment context is not "less exacting than [our] application of the standard in other kinds of cases." *Duncan v. Bonta*, 19 F.4th 1087, 1138 (9th Cir. 2021) (en banc) (Berzon, J., concurring). Regardless, there are several related principles at play here that nonetheless reveal that the government has failed to meet even the more lenient version of the "fit" requirement that we have sometimes applied.

The relevant related principles can be grouped into two main categories. First, the government "must affirmatively establish the reasonable fit we require." *See Bd. of Trs. of*

*State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). "This burden is not satisfied by mere speculation or conjecture," *Edenfield v. Fane*, 507 U.S. 761, 770 (1993), but by "substantial evidence" that the challenged restrictions will alleviate the harm. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 666 (1994). Though this court has not yet addressed the requisite threshold for "substantial evidence," it has, when applying intermediate scrutiny, repeatedly relied on at least *some* evidence or explanation from the government that purportedly relates to and supports the restriction of Second Amendment rights in particular. *See, e.g., Jackson*, 746 F.3d at 965 (discussing evidence related to the particular dangers associated with gun ownership in support of the city's gun regulation).[23] Second, when applying intermediate scrutiny, courts must consider "less-burdensome alternatives," *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993); and evaluate "exemptions and inconsistencies" that undercut the reasonableness of the purported fit. *See Greater New Orleans Broad. Assn., Inc. v. United States*, 527 U.S. 173, 190 (1999).[24]

---

[23] *See also Mai*, 952 F.3d at 1117; *Pena*, 898 F.3d at 980; *Silvester*, 843 F.3d at 828; *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015); *Chovan*, 735 F.3d at 1140.

[24] While Board of Trustees of State University of New York, Edenfield, Turner Broadcasting System, Inc., City of Cincinnati, and Greater New Orleans Broadcasting Association, Inc. address First Amendment challenges, as noted above, First Amendment principles inform the application of intermediate scrutiny in the Second Amendment context—in fact, that's where the "reasonable fit" test originally came from. *See Mai*, 974 F.3d at 1103 (VanDyke, J., dissenting from the denial of rehearing en banc) (describing the history of our Second Amendment intermediate scrutiny test). Moreover, our sister circuits have considered less burdensome alternatives as relevant to a proper analysis of restraints imposed on Second Amendment rights.

Applying these principles, the County has failed to meet its burden here.  Appellees omit *any* evidence or argumentation suggesting that the closure of gun shops, ammunition shops, and firing ranges stems the spread of COVID any more than the closure of bike shops, hardware stores, and golfing ranges.  Instead, Appellees' one-sentence justification on appeal of the Orders' "reasonable fit" is that "social isolation is considered useful as a tool to control the spread of pandemic viral infections."  But this carte-blanche rationale—that has nothing to do with the actual fundamental right at issue—is riddled with exemptions and inconsistencies.  If social isolation is the paramount concern, why allow bicycle shops, hardware stores, and golfing ranges to remain open?  As noted above, it ultimately boils down to the government's designation of "essential" and "non-essential" businesses—but nowhere has the government here explained why gun stores, ammunition stores, and firing ranges are "non-essential" businesses while bicycle shops, hardware stores, and golfing ranges are "essential."

Not only did Appellees fail to provide *any* evidence or explanation suggesting that gun shops, ammunition shops, and firing ranges posed a greater risk of spreading COVID-19 than other businesses and activities deemed "essential," but they also failed to provide any evidence that they considered less restrictive alternatives for the general public.  It's not as if alternatives were unavailable: the County eventually utilized one such alternative for those who had purchased firearms before March 20 by allowing receipt of those pre-purchased firearms on an appointment-only basis.  It declined to extend this option to those who had not yet

---

*See, e.g., Heller v. District of Columbia*, 801 F.3d 264, 277–78 (D.C. Cir. 2015); *Ezell v. City of Chicago*, 651 F.3d 684, 709 (7th Cir. 2011).

purchased a firearm by March 20, however, without any explanation.  Indeed, the only evidence in the record that specifically pertains to the actual Second Amendment rights at issue directly undercuts the reasonableness of the fit: CISA (the federal agency) had specifically identified "workers supporting the operation of firearm or ammunition . . . retailers . . . and shooting ranges" as "essential critical infrastructure workers."  If the government actually has any burden at all—which our court has repeatedly said it does, even under intermediate scrutiny—then at a minimum it means that the government must provide *some* explanation that pertains to the specific risks associated with the fundamental right at issue.  It did not do so here, and therefore failed to meet any burden in showing a reasonable fit.  Instead, it summarily devalued a fundamental right by deeming businesses essential to the exercise of that right as "non-essential," without any proffered rationale whatsoever.  This cannot survive any type of heightened scrutiny where the government bears some burden.

## CONCLUSION

The district court erred in determining that *Jacobson* applied to Appellants' Second Amendment claim, and in the alternative, that intermediate scrutiny applied.  It also erred in determining that the Orders survived even intermediate scrutiny.  We therefore reverse the district court's order granting Appellees' motion to dismiss and remand for further proceedings.

KLEINFELD, Circuit Judge, concurring:

I concur in the result, but write separately for two reasons.  First, we need not reach the question whether strict scrutiny applies, so I would not.  While strict scrutiny may be appropriate, as the majority concludes, nevertheless we should not make more law than is necessary to decide the case.  Second, I wish to expand upon the absence of justification in the record for what the County did.

The Supreme Court and we have held that rational basis review is not appropriate to a statute (let alone a mere edict by a county official, as here) challenged under the Second Amendment.[1]  We and other circuits have used First Amendment analysis as a guide.[2]  In *Packingham v. North Carolina*,[3] a recent First Amendment challenge to a prohibition against a registered sex offender accessing social media sites, the Supreme Court explained that "to survive intermediate scrutiny, a law must be 'narrowly tailored to serve a significant governmental interest.'"[4]  The fit between the governmental objective and the prohibition need not be perfect, but it must be reasonable.[5]  To survive intermediate scrutiny, the government cannot "burden substantially more

---

[1] *See District of Columbia v. Heller*, 554 U.S. 570, 628 n.27; *Duncan v. Bonta*, __ F.4th __, (9th Cir. Nov. 30, 2021).

[2] *See Duncan v. Bonta*, __ F.4th __, (9th Cir. Nov. 30, 2021); *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021); *Kanter v. Barr*, 919 F.3d 437, 448 (7th Cir. 2019); *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010).

[3] 137 S. Ct. 1730 (2017).

[4] *Packingham*, 137 S. Ct. at 1736 (internal citation omitted).

[5] *See Duncan v. Bonta*, __F.4th __, (9th Cir. Nov. 30, 2021).

speech than is necessary to further the government's legitimate interests."**6**   A valid governmental interest (in *Packingham*, keeping child molesters from using Facebook and Twitter to find new victims) is not adequate to insulate the restriction from all constitutional protections.**7**   The State must "me[e]t its burden to show that th[e] sweeping law is necessary or legitimate to serve that purpose."**8**   While the government's burden of proof is not "unnecessarily rigid," the evidence in the record must still "fairly support" the government's position.**9**   Of course, "we defer to reasonable legislative judgments."**10**   In the case before us, the challenged order is not a "legislative judgment," merely an edict by a subordinate official within the County executive, presumably entitled to less deference than a legislative judgment.

Thus, regardless of whatever deference this edict may receive, the County bears the burden of establishing a "reasonable fit" between its purpose of slowing the spread of the virus and its prohibition of sales of and practice at gun ranges with guns and ammunition.   That purpose is legitimate, but the legitimacy of the purpose is not enough to abridge a constitutional right.   The County must show that

---

**6** *Packingham*, 137 S. Ct. at 1736. (internal quotation marks and citation omitted).

**7** *See Id*.

**8** *Id.* at 1737.

**9** *Duncan*, __ F.4th at __ (internal quotation marks and citation omitted).

**10** *Id*.

the evidence in the record establishes a reasonable fit of the edict to the legitimate purpose.

Since the constitutional challenge in this case was dismissed for failure to state a claim upon which relief could be granted, for purposes of decision we must proceed on the basis of the facts averred in the complaint, together with documents incorporated by reference or judicially noticed.[11] The challenge arises from a series of orders issued by Ventura County's Public Health Medical Director and Health Officer prohibiting the acquisition of firearms and ammunition from licensed dealers, even if purchasers had already paid for them, and prohibiting the operation of firing ranges necessary for training and practice in the safe use of firearms.[12]

The structure of the orders was to require everyone in the County to stay within their residence and to require all businesses to close and to prohibit all travel, but with a series of exceptions. Generally in the Anglo-American tradition, everything is permitted except what is expressly prohibited. The Health Officer's orders instead prohibited everything except what they expressly permitted. The scope of the exceptions is thus critical to the orders' constitutionality.

The exceptions included leaving one's residence for outdoor activities such as bicycling and later golfing, but not shooting at outdoor gun ranges. Delivery of any "household consumer products" was excepted, but not delivery, even at the door of a licensed dealer, of guns or ammunition.

---

[11] *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

[12] First Amended Complaint ¶ 50–55.

"Hardware stores" were excepted, but apparently not if the hardware consisted of firearms or ammunition. Subsequent emendations to the orders allowed people to shop in person for cars and bicycles, and to take possession of firearms previously purchased and paid for. The parties do not disagree that gun stores and shooting ranges were ordered closed, on pain of criminal penalties,[13] during the periods at issue.

There is no evidence whatsoever in the record to show why the particular inclusions and exceptions relating to firearms, ammunition, and shooting ranges reasonably fit the purpose of slowing the spread of the COVID-19 virus. The only document the County points to as justification is the edict itself, in which its Health Officer recites in the "Whereas" clauses that "social isolation is considered useful" for this purpose. The County provides no evidence and no justification for why bicycles could be purchased and delivered, for example, but firearms could not even be picked up at the storefront, or for why such outdoor activities as walking, bicycling, and golfing were allowed, but acquiring and maintaining proficiency at outdoor shooting ranges was not.

The State of California Public Health Officer had made an exception to the statewide order confining people to their residences for workers needed to "maintain continuity of operations of the federal critical infrastructure sectors" of the economy.[14] The federal government had advised that gun stores should be treated as "essential critical infrastructure," but the County offers no justification whatsoever, let alone

---

[13] *Id.* at ¶ 48–49.

[14] *Id.* at ¶ 37–39.

evidence, for why it did not so treat gun stores, as the State exception and federal advisory memorandum did. The federal guidance, ignored without any stated reason by the County, deemed "workers supporting the operation of firearm or ammunition product manufacturers, retailers, importers, distributors, and shooting ranges" to be within the "critical infrastructure workforce."

The dramatically broad County Health Officer's edict established that anyone in the County could be arrested and put in jail for myriad activities outside the home or for engaging in commercial transactions other than those explicitly excepted from the edict, yet the County offers no evidence nor even any argument for the apparently arbitrary list of exclusions. Nor does the County make any effort, not by presenting evidence, nor even by presenting argument, for why such constitutionally protected activities, whether public speech, or going to church, or purchasing and practicing with firearms and ammunition, were simply banned, instead of accommodated with a reasonable fit to the purpose of slowing the spread of the virus. The government's argument seems to be that so long as it satisfies the first step of intermediate scrutiny, showing some legitimate purpose, it has no burden under the second step, to establish a reasonable fit with that purpose. If that were correct, the County could order the closure of Mexican restaurants but make an exception for French restaurants, because the arbitrariness of that distinction would not matter any more than the distinction between bicycling and shooting at outdoor gun ranges. Such arbitrariness is not the law.

I therefore concur in reversing the district court. If, under intermediate scrutiny in *Packingham*,[15] a child molester cannot be prohibited from accessing social media sites, because such a prohibition excessively restricts access to legitimate speech,[16] then *a fortiori* a legitimate gun purchaser cannot have his constitutional right to acquire firearms and ammunition, and to develop and maintain proficiency with them at outdoor shooting ranges, suspended indefinitely under a "broad stroke"[17] prohibition riddled with exceptions for other quite similar activities, without more from the government other than the assertion that "the law must be this broad"[18] to serve its purpose. On the record before us, all we have is a series of orders allowing some retailing of hardware and other consumer products but not firearms or ammunition, and allowing some outdoor activities such as golfing and bicycling but not shooting at outdoor firing ranges. Nothing in the record explains why. The County has simply neglected to make a record that could justify its actions. Neither pandemic nor even war wipes away the Constitution.[19]

---

[15] *Packingham*, 137 S. Ct. at 1737.

[16] *Id*.

[17] *Id*.

[18] *Id*.

[19] *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004).

VANDYKE, Circuit Judge, concurring:

I agree wholeheartedly with the majority opinion, which is not terribly surprising since I wrote it. But I write separately to make two additional points. The first is simply to predict what happens next. I'm not a prophet, but since this panel just enforced the Second Amendment, and this is the Ninth Circuit, this ruling will almost certainly face an en banc challenge. This prediction follows from the fact that this is *always* what happens when a three-judge panel upholds the Second Amendment in this circuit. *See, e.g.*, *Young v. Hawaii*, 896 F.3d 1044, 1048 (9th Cir. 2018), *on reh'g en banc*, 992 F.3d 765 (9th Cir. 2021) (en banc) (overturning the three-judge panel); *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1147 (9th Cir. 2014), *on reh'g en banc*, 824 F.3d 919 (9th Cir. 2016) (en banc) (same); *Duncan v. Becerra*, 970 F.3d 1133, 1138 (9th Cir. 2020), *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (en banc) (same). Our circuit has ruled on dozens of Second Amendment cases, and without fail has *ultimately* blessed *every* gun regulation challenged, so we shouldn't expect anything less here. *See Duncan*, 19 F.4th at 1165 (VanDyke, J., dissenting).

My second point is related to the first. As I've recently explained, our circuit can uphold any and every gun regulation because our current Second Amendment framework is exceptionally malleable and essentially equates to rational basis review. *See id.* at 1162–63; *Mai v. United States*, 974 F.3d 1082, 1101 (9th Cir. 2020) (VanDyke, J., dissenting from the denial of rehearing en banc) ("Particularly in [the Second Amendment] context, we have watered down the 'reasonable fit' prong of intermediate scrutiny to little more than rational basis review."). Our court normally refers to our legal test as a two-step inquiry,

*see United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013), although it may be better understood as a "tripartite binary test with a sliding scale and a reasonable fit"—a test that "only a law professor can appreciate." *Rhode v. Becerra*, 445 F. Supp. 3d 902, 930 (S.D. Cal. 2020). The complex weave of multi-prong analyses embedded into this framework provide numerous off-ramps for judges to uphold any gun-regulation in question without hardly breaking a sweat. *See Duncan*, 19 F.4th at 1164–65 (VanDyke, J., dissenting).

Given both of these realities—that (1) no firearm-related ban or regulation ever ultimately fails our circuit's Second Amendment review, and (2) that review is effectively standardless and imposes no burden on the government—it occurred to me that I might demonstrate the latter while assisting my hard-working colleagues with the former. Those who know our court well know that all of our judges are very busy and that it's a lot of work for any judge to call a panel decision en banc. A judge or group of judges must first write a call memo, and then, if the en banc call is successful, the en banc majority must write a new opinion. Since our court's Second Amendment intermediate scrutiny standard can reach any result one desires, I figure there is no reason why I shouldn't write an alternative draft opinion that will apply our test in a way more to the liking of the majority of our court. That way I can demonstrate just how easy it is to reach any desired conclusion under our current framework, and the majority of our court can get a jump-start on calling this case en banc. Sort of a win-win for everyone. To better explain the reasoning and assumptions behind this type of analysis, my "alternative" draft below will contain footnotes that offer further elaboration (think of them as "thought-bubbles"). The path is well-worn, and in a few easy steps any firearms regulation, no matter how

draconic, can earn this circuit's stamp of approval.   Here goes:

## BACKGROUND

The rapid onset of the COVID-19 pandemic disrupted every facet of life across the globe and has claimed millions of lives. In the early days of the pandemic, when information was scarce and panic was setting in, governments were forced to take immediate action.  Accordingly, the County of Ventura issued a series of health orders ("Orders") to slow the spread of the disease. These Orders, among other things, required the immediate closure of all non-essential businesses, including firearm stores and firing ranges.   The county continually updated and modified the Orders, and allowed these businesses to reopen as soon as it was safe to do so.  All told, firearm stores and ranges were closed for 48 days. During that time, Plaintiffs sued the county, alleging that these Orders impermissibly burdened their Second Amendment rights.

## DISCUSSION

### A.  Legal Framework

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In the leading case on the Second Amendment, the

Supreme Court invalidated a District of Columbia regulation that banned possession of handguns in the home and required other firearms to generally be kept "unloaded and disassembled or bound by a trigger lock or similar device." *District of Columbia v. Heller*, 554 U.S. 570, 575 (2008). Two years later, the Supreme Court incorporated the Second Amendment against the states and invalidated a Chicago handgun possession ban similar to the one in *Heller*. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010). But in invalidating the challenged regulations, both *Heller* and *McDonald* explained that the rights established by the Second Amendment are "not unlimited." *Heller*, 554 U.S. at 595; *McDonald*, 561 U.S. at 786.[1]

Our circuit, like most of our sister circuits, have discerned from *Heller* and *McDonald* a two-step framework for analyzing Second Amendment claims. At

---

[1] We really like this "not unlimited" language from *Heller*, and cite it often and enthusiastically. *See, e.g.*, *Young v. Hawaii*, 992 F.3d 765, 782 (9th Cir. 2021) (en banc); *Mai v. United States*, 952 F.3d 1106, 1113 (9th Cir. 2020); *Peruta v. Ctny. of San Diego*, 824 F.3d 919, 928 (9th Cir. 2016) (en banc); *Silvester v. Harris*, 843 F.3d 816, 819 (9th Cir. 2016); *Silvester*, 843 F.3d at 829 (Thomas, C.J., concurring); *Chovan*, 735 F.3d at 1133; *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010). One might conclude it is the driving force in our circuit's Second Amendment jurisprudence.

step one, our court looks to see if the challenged law burdens conduct protected by the Second Amendment by examining the "historical understanding of the scope of the right." *Silvester*, 843 F.3d at 821 (quoting *Heller*, 554 U.S. at 625). If the law is outside the historical scope of the Second Amendment or falls within "presumptively lawful regulations," the law is upheld. *Id.*

If the law does implicate conduct protected by the Second Amendment, then the court must continue to step two and determine which level of scrutiny to apply. *See Chovan*, 735 F.3d at 1136. The appropriate level of scrutiny depends on "(1) 'how close the law comes to the core of the Second Amendment right,' and (2) 'the severity of the law's burden on the right.'" *Id.* at 1138 (quoting *Ezell v. City of Chicago,* 651 F.3d 684, 703 (7th Cir. 2011)). A law that destroys the Second Amendment right is unconstitutional under any level of scrutiny; a law that both implicates the core of the Second Amendment and severely burdens that right is subject to strict scrutiny;[2] all other laws are subject to intermediate scrutiny. *Young*, 992 F.3d at 784.

---

[2] We refer to strict scrutiny as a theoretical matter—a thought-experiment, really. Our court has never ultimately applied strict scrutiny to any real-life gun regulation.

## B.  Application

### a.  Step One

We begin by first deciding if the Orders burden conduct historically protected by the Second Amendment.  Such historical analysis is not easy, "and the courts of appeals have spilled considerable ink in trying to navigate the Supreme Court's framework." *Pena v. Lindley*, 898 F.3d 969, 976 (9th Cir. 2018).  Yet history suggests that delays in taking possession of a firearm was not considered a substantial burden on the Second Amendment:

> Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one.  As a purely practical matter, delivery took time.  Our 18th and 19th century forebears knew nothing about electronic transmissions.  Delays of a week or more were not the product of governmental regulations, but such delays had to be routinely accepted as part of doing business.

*Silvester*, 843 F.3d at 827.  Even with this history as a guide, however, we are unable to definitively rule on the historical pedigree

of the county's Orders.  The parties did not brief the historical contours of regulations like these, and for good reason.  The complexity and novelty of the challenges raised by COVID-19 are not easily mapped onto 18th or 19th century practices and understandings.

Therefore, we elect to follow the "well-trodden and 'judicious course'" of assuming, rather than deciding, that the regulation at hand burdens conduct protected by the Second Amendment. *Pena*, 898 F.3d at 976 (quoting *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013)); *see also Mai*, 952 F.3d at 1114–15; *Fyock v. City of Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015).[3]

---

[3] Here's the deal: Whenever we think the history helps us in upholding the challenged regulation, we're happy to rely on it in step one of our test. *See, e.g.*, *Young*, 992 F.3d at 784–826.  But most of the time the history either doesn't help us uphold the gun regulation, is indeterminate, or is just really hard to evaluate.  So usually we just skip over step one of our "two-step" test by assuming the challenged regulation burdens Second Amendment-protected conduct.  But that's okay, because the real beauty of our two-step test is its amazing flexibility at the various stages of step two in balancing the government's asserted interest versus the claimed impact on the "core" of the Second Amendment.

### b. Step Two

Assuming without deciding that the Orders burden conduct protected by the Second Amendment, we must now determine which level of scrutiny applies. Again, this is determined by looking at "(1) 'how close the law comes to the core of the Second Amendment right,' and (2) 'the severity of the law's burden on the right.'" *Chovan*, 735 F.3d at 1138 (quoting *Ezell,* 651 F.3d at 703). We have explained that intermediate scrutiny is appropriate "when a challenged regulation does not place a substantial burden on Second Amendment rights." *Silvester*, 843 F.3d at 827.[4] Here, we can't say the Orders imposed a *severe* burden on anyone's ability to exercise their

---

[4] It is important to recognize that all the real work in our Second Amendment test is done right here. First, notice how much discretion this test gives us judges! There is so much flexibility in deciding whether anything short of an outright permanent ban (which nobody is dumb enough to enact anymore) places a "severe burden" on the Second Amendment. We can always point to stuff that *isn't* banned in concluding this particular regulation isn't a "substantial burden." And second, once we've concluded that a challenged regulation does *not* place a "substantial burden on Second Amendment rights," it's really game over. A regulation that we've already determined does not substantially burden the Second Amendment can be upheld easy-peasy under our watered-down intermediate scrutiny test.

Second Amendment rights.[5]   The Orders only *temporarily* delayed the sale of firearms and use of firearms at firing ranges, which is a far cry from the complete and permanent ban of handguns as invalidated in *Heller*.[6]  Moreover, we have already upheld government regulations that result in the temporary delay of an individual's ability to take possession of firearms under intermediate scrutiny.  *See Silvester*, 843 F.3d at 827.  And here, as in *Silvester*, "[t]he regulation does not prevent, restrict, or place any conditions on how guns are stored or used *after* a purchaser takes possession."  *Id.* (emphasis added).

Finally, a delay in acquiring a firearm is hardly a foreign concept to California residents.  As *Silvester* explained, California generally requires firearm purchasers to undergo a background check, in which the "California DOJ has the authority to delay the delivery of a firearm for up to thirty days in order to complete the background check."

---

[5] "Severe" is a very strong word, and a real workhorse when *italicized*.

[6] Another one of our favorite tricks.  Once you frame *Heller* as speaking *only* to complete and total bans, it's easy to side-step its holding.  All a judge has to do is pretend the Supreme Court would have allowed anything short of DC's drastic prohibition in *Heller*, instead of viewing *Heller* as easily correcting an especially egregious constitutional violation.

*Id.* at 825 (citing Cal. Penal Code § 28220(f)).[7]

We conclude therefore that the Orders do not severely burden any Second Amendment right implicating the core of the Second Amendment, so intermediate scrutiny is appropriate.[8]

### c. Intermediate Scrutiny

Applying intermediate scrutiny, we require "(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Chovan*, 735 F.3d at 1139.

The first prong is certainly met here.[9] The Supreme Court has stated that

---

[7] Sure, the typical delay in *Silvester* was much shorter than the almost two-month delay here. But this is merely a difference in *degree*, not *kind*, and we don't think the difference is so "*severe*" as to merit strict scrutiny.

[8] Whew. Hard work done. It's all downhill from here!

[9] The first prong is always met in Second Amendment cases. Guns are dangerous, after all, so the government's interest in ameliorating such danger is always important. At first we were worried this case might be a problem, because the regulations here don't really have any nexus to the dangerousness of guns. But COVID-19 is dangerous too, so that substitutes in nicely.

"[s]temming the spread of COVID-19 is unquestionably a compelling interest," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020), and petitioners do not claim otherwise. What petitioners *do* challenge is that the Orders are not a reasonable fit with the stated objective of slowing the spread of COVID-19, since other stores remained open while firearm stores and ranges were closed.

But this argument misconstrues intermediate scrutiny. "The [intermediate scrutiny] test is not a strict one. We have said that intermediate scrutiny does not require the least restrictive means of furthering a given end."[10]  *Silvester*, 843 F.3d at 827 (internal citation and quotation marks omitted).  The State is

---

[10] We've really gotten a lot of mileage out of this concept. One might think that because the "first prong" (government's important interest) will *always* be met in Second Amendment cases (because guns are inherently dangerous), that the "reasonable fit" part of the test would take on special significance. But thankfully the opposite is true. We've been able to water down the "fit" part of the test for Second Amendment cases to such an extent that many of our judges have been forced distance our Second Amendment case law from the First Amendment case law from which it was supposedly borrowed. *See Duncan*, 19 F.4th at 1116 (Graber, J., concurring) ("To be sure, the First Amendment and the Second Amendment differ in many important respects (including text and purpose), and the analogy is imperfect at best.").

required to show only that the regulation "promotes a substantial government interest that would be achieved less effectively absent the regulation."[11] *Id.* at 829 (quoting *Fyock*, 779 F.3d at 1000).

The Orders, in preventing employees and customers from interacting indoors during the COVID-19 pandemic, clearly promote the county's interest in slowing the spread of COVID-19 more than if no such Orders were issued. Plaintiffs argue that Ventura County failed to meet this standard because it did not offer any evidence connecting the spread of COVID-19 to firearm retailers or firing ranges. But this again places too great a burden on the county. Localities "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems," *Jackson*, 746 F.3d at 969–70 (internal citation omitted), and this is even more true when faced with a global pandemic. Especially in the beginning days of the COVID-19 pandemic, the type of hard evidence Plaintiffs demand was simply not available, or at a minimum, rapidly evolving.

---

[11] I know this sounds a lot like rational basis review. After all, if a government interest would be "achieved [*more*] effectively *absent* the [challenged] regulation," it's hard to see how that regulation would survive even rational basis scrutiny. But trust us, this is heightened scrutiny. So very heightened.

Plaintiffs' demands are also inconsistent with our case law. When officials are forced to "'act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614 (2020) (Roberts, C.J., concurring) (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)). But this is not to say Ventura County acted irrationally. There is a clear and straight-forward logic underlying the Orders: limit to the extent possible any interactions that could facilitate the spread of COVID-19. These Orders reflected the then-current scientific understanding of COVID-19, as reflected in the social distancing requirements and the closing of non-essential businesses. And this court has repeatedly allowed common-sense to undergird a government's evidence when justifying a regulation in the Second Amendment context. *See, e.g.*, *Chovan*, 735 at 1135 (citing approvingly the Seventh Circuit for upholding a challenged regulation "[i]n light of '[b]oth *logic* and data'" (quoting *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010))) (emphasis added); *Silvester*, 843 F.3d at 828 (concluding that the empirical studies available supported "the common sense

understanding" behind the waiting period regulation at issue).[12]

\* \* \*

Like every locality in the United States, Ventura County was forced to rapidly respond to an unprecedented pandemic. As the death toll for its citizens continued to rise, the county temporarily closed firearm stores and firing ranges, but lessened, and then eventually withdrew, those restrictions when the pandemic allowed. Plaintiffs may disagree with Ventura County's decisions, but it is not our job—now with the benefit of hindsight—to dictate what Orders we would have found best. Local officials "should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *S. Bay United Pentecostal Church*, 140 S. Ct. at 1614 (Roberts, C.J., concurring) (citation omitted).

---

[12] Again, it doesn't matter much what we say here. Once we're allowed to effectively balance competing interests under our Second Amendment intermediate scrutiny, it's so easy justifying a regulation that we could easily just delegate this part of the opinion to our interns.

For these reasons, we affirm the district court's dismissal of Plaintiffs' complaint for failure to state a claim.

You're welcome.